## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Tampa Division

| | | |
|---|---|---|
| _____ ) | | |
| PEGASUS IMAGING CORPORATION, ) | | |
| a Florida Corporation ) | | |
| ) | | |
| Plaintiff, ) | Case No. 8:07-cv-01937-T-27EAJ | |
| ) | | |
| v. ) | **DEFENDANT NORTHROP** | |
| ) | **GRUMMAN INFORMATION** | |
| NORTHROP GRUMMAN ) | **TECHNOLOGY'S ANSWER AND** | |
| CORPORATION, ) | **AFFIRMATIVE DEFENSES TO THE** | |
| a Delaware Corporation, and ) | **SECOND AMENDED COMPLAINT,** | |
| NORTHROP GRUMMAN ) | **AND COUNTERCLAIM** | |
| INFORMATION TECHNOLOGY, ) | | |
| a Delaware Corporation ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

### ANSWER

Defendant Northrop Grumman Information Technology ("NGIT") hereby files its Answer and Affirmative Defenses to the Second Amended Complaint ("SAC") (D.E. 60). Pursuant to Fed. R. Civ. P. 13(a), NGIT also states a counterclaim, which is pled below.

### Jurisdiction, Parties, and Venue

1.  Paragraph 1 asserts a legal conclusion as to which no response is required.

2.  Paragraph 2 asserts a legal conclusion as to which no response is required.

3.  NGIT admits the allegations in Paragraph 3.

4.  NGIT admits that NGC is a Delaware corporation with its principal place of business in Los Angeles, California, that NGC is the parent corporation of certain other business organizations that serve a variety of government and commercial customers. NGIT denies the remaining allegations in this Paragraph.

5.      NGIT admits that it is a Delaware corporation and a wholly owned subsidiary of Northrop Grumman Systems Corporation ("NGSC"), which is, in turn, a wholly owned subsidiary of NGC.  NGIT denies that its principal place of business is California.  NGIT admits that it provides information technology solutions to both public and private sector customers. NGIT admits that it is and has been registered to do business in Florida, and that it has done business in Florida.  NGIT denies the remaining allegations in this Paragraph.

6.      NGIT admits the allegations with respect to the acquisition and merger of Integic and denies the remaining allegations in Paragraph 6.

7.      NGIT admits that Integic used both employees and independent contractors to fulfill contractual obligations in Florida, and that Integic derived a small percentage of its total revenue from business in Florida.

8.      NGIT admits that it acquired a controlling stake in Integic in March 2005 and that Integic was wholly merged into NGIT in December 2007.  The second sentence of Paragraph 8 asserts a legal conclusion to which no response is required.

9.      NGIT denies the allegations in Paragraph 9, except to state that NGIT does not respond to the allegations that relate solely to NGC, which has filed a separate Answer, and to admit that the numbered subparagraphs within Paragraph 9 summarize the various claims asserted by Pegasus.

10.     Paragraph 10 asserts a legal conclusion as to which no response is required.

11.     Paragraph 11 asserts a legal conclusion as to which no response is required.

12.     The allegations in Paragraph 12 amount to an interpretation of the Court's Local Rules, to which no response is required.

## Background and Facts Supporting Requested Relief

13.    NGIT admits that Pegasus is in the business of licensing computer software programs, one of which is known as ImagXpress, which is used for image processing. NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 13 concerning the details of Pegasus's development of the ImagXpress program.

14.    NGIT answers Paragraph 14 as follows: As to the first sentence, NGIT admits that Integic played a primary role in creating CHCS II (otherwise known as AHLTA) on behalf of the federal government. As to the second sentence, NGIT admits that CHCS II and AHLTA refer to the same system. As to the third sentence, NGIT admits that Integic entered into a license agreement with Pegasus with respect to ImagXpress, and otherwise denies the allegations in that sentence. As to the fourth and fifth sentences, NGIT admits that Integic and NGIT have provided certain services with respect to CHCS I and AHLTA in Florida, and otherwise denies the allegations in those sentences.

15.    NGIT admits that, on or about March 16, 2004 and February 24, 2006, Integic downloaded one copy of ImagXpress from Pegasus's website and that both such downloads included a license agreement. NGIT further admits that Exhibit "A" is a copy of an ImagXpress license agreement that NGIT believes accompanied Integic's 2004 download. NGIT lacks sufficient knowledge to admit or deny the allegation that the agreement attached as Exhibit "A" was included with both of Integic's 2004 and 2006 downloads or that it is an "exemplar" of anything. NGIT denies the remaining allegations in Paragraph 15.

16.    NGIT denies the allegations in Paragraph 16.

17.    NGIT answers Paragraph 17 as follows: As to the first sentence, NGIT lacks sufficient knowledge to admit or deny Pegasus's allegations as to the precise number and

location of MTFs at which AHLTA is currently used by the military. NGIT admits the second and third sentences. As to the fourth sentence, NGIT admits that Integic developed various Builds and Releases of AHLTA, and otherwise denies the allegations in that sentence. NGIT denies the allegations in the fifth sentence, except to admit that Integic worked on the development of AHLTA and has knowledge of it.

18.    NGIT denies the allegations in Paragraph 18.

19.    NGIT answers Paragraph 19 as follows: NGIT denies the allegations in the first sentence except to admit that NGIT acquired Integic. NGIT states that the second sentence is incomprehensible, and therefore denies the allegations in that sentence. NGIT denies the third sentence. NGIT admits that, by January 1, 2008, any remaining business divisions of Integic were operating as divisions of NGIT. NGIT denies the fifth sentence.

20.    NGIT denies the allegations in Paragraph 20.

21.    NGIT denies the allegations in Paragraph 21, except to admit that, after NGIT acquired Integic, certain Integic employees became NGIT employees.

22.    NGIT denies the allegations in Paragraph 22, except to admit that, after NGIT acquired Integic, certain Integic employees became NGIT employees.

23.    NGIT denies the allegations in Paragraph 23.

24.    NGIT denies the allegations in Paragraph 24.

25.    NGIT denies the allegations in Paragraph 25.

26.    NGIT answers Paragraph 26 as follows: As to the first sentence, NGIT admits that Integic was wholly merged into NGIT in December 2007, and states that the remaining allegations in that sentence assert a legal conclusion to which no response is required. As to the

second sentence, NGIT admits that Exhibit B to the SAC is a copy of the Articles of Merger and the Plan of Merger.

27.    NGIT answers Paragraph 27 as follows:  NGIT admits the first sentence.  NGIT denies the allegations in the second sentence, except to admit that Pegasus made various unfounded allegations of wrongful conduct.  NGIT denies the third sentence.

28.    NGIT lacks sufficient knowledge to admit or deny Pegasus's allegations regarding what "[r]eports indicate."

29.    NGIT admits that Integic and NGIT have been paid by the federal government for their work on AHLTA and otherwise denies the allegations in Paragraph 29.

30.    NGIT answers Paragraph 30 as follows:  As to the first sentence, NGIT admits that Integic and NGIT have been paid by the federal government for their work on AHLTA and otherwise denies the allegations in that sentence.  NGIT admits the second sentence.

31.    NGIT denies the allegations in Paragraph 31.

## Count I:  Breach of License

32.    NGIT incorporates by reference Paragraphs 1 through 31.

33.    NGIT admits that Paragraph 33 summarizes the allegations in Count I, and otherwise denies the allegations in Paragraph 33.

34.    NGIT admits that, on or about March 16, 2004 and February 24, 2006, Integic downloaded one copy of ImagXpress from Pegasus's website and that both such downloads included a license agreement.  NGIT further admits that Exhibit "A" is a copy of an ImagXpress license agreement that NGIT believes accompanied Integic's 2004 download.  NGIT lacks sufficient knowledge to admit or deny the allegation that the agreement attached as Exhibit "A"

was included with both of Integic's 2004 and 2006 downloads or that it is an "exemplar" of anything. NGIT denies the remaining allegations in Paragraph 34.

35.     Paragraph 35 purports to characterize the terms of the License, which speaks for itself with respect to its contents.

36.     Paragraph 36 purports to characterize the terms of the License, which speaks for itself with respect to its contents.

37.     Paragraph 37 purports to characterize the terms of the License, which speaks for itself with respect to its contents.

38.     NGIT admits that Paragraph 38 accurately quotes certain provisions of the License, and otherwise denies the allegations in Paragraph 38.

39.     NGIT denies the allegations in Paragraph 39.

40.     NGIT denies the allegations in Paragraph 40.

41.     NGIT admits that Paragraph 41 accurately quotes a provision of the License, and otherwise denies the allegations in Paragraph 41.

42.     NGIT denies the allegations in Paragraph 42.

43.     NGIT denies the allegations in Paragraph 43.

### Count II:  Copyright Infringement

44.     NGIT incorporates by reference Paragraphs 1 through 31.

45.     NGIT admits that Paragraph 45 summarizes the allegations in Count II, and otherwise denies the allegations in Paragraph 45.

46.     NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 46.

47.     NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 47.

48.     NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 48.

49.     NGIT admits that Pegasus and Integic are parties to the License Agreement, and states that the License Agreement speaks for itself with respect to its contents.

50.     NGIT denies the allegations in Paragraph 50.

51.     NGIT denies the allegations in Paragraph 51.

52.     NGIT denies the allegations in Paragraph 52.

53.     NGIT denies the allegations in Paragraph 53.

54.     NGIT denies the allegations in Paragraph 54.

55.     NGIT denies the allegations in Paragraph 55.

56.     NGIT denies the allegations in Paragraph 56.

57.     NGIT answers Paragraph 57 as follows:  NGIT denies the allegations in the first sentence, except to admit that Pegasus made various unfounded allegations of wrongful conduct. NGIT denies the second sentence.

58.     NGIT denies the allegations in Paragraph 58.

59.     NGIT lacks sufficient knowledge to admit or deny the allegations as to what "Pegasus believes," and otherwise denies the allegations in Paragraph 59.

60.     NGIT denies the allegations in Paragraph 60.

61.     NGIT denies the allegations in Paragraph 61.

62.     NGIT denies the allegations in Paragraph 62.

63.     NGIT denies the allegations in Paragraph 63.

## Count III:  Copyright Infringement

64.     NGIT incorporates by reference Paragraphs 1 through 31.

65.     NGIT admits that Paragraph 65 summarizes the allegations in Count III, and otherwise denies the allegations in Paragraph 65.

66.     NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 66.

67.     NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 67.

68.     NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 68.

69.     NGIT admits that Pegasus and Integic are parties to the License Agreement, and states that the License Agreement speaks for itself with respect to its contents.

70.     NGIT denies the allegations in Paragraph 70.

71.     NGIT denies the allegations in Paragraph 71.

72.     NGIT admit that, during what Pegasus refers to as the "Transitional Period," certain Integic employees reported to certain employees of NGIT, and that certain Integic and NGIT back-office systems were integrated, and otherwise denies the allegations in Paragraph 72.

73.     NGIT admit that, during what Pegasus refers to as the "Transitional Period," certain Integic employees reported to certain employees of NGIT, and that certain Integic and NGIT back-office systems were integrated, and otherwise denies the allegations in Paragraph 73.

74.     NGIT denies the allegations in Paragraph 74.

75.     NGIT answers Paragraph 75 as follows:  NGIT denies the allegations in the first sentence, except to admit that Pegasus made various unfounded allegations of wrongful conduct. NGIT denies the second sentence.

76.     NGIT denies the allegations in Paragraph 76.

77.     NGIT denies the allegations in Paragraph 77.

78.     NGIT denies the allegations in Paragraph 78.

79.     NGIT denies the allegations in Paragraph 79.

80.     NGIT denies the allegations in Paragraph 80.

81.     NGIT denies the allegations in Paragraph 81.

82.     NGIT denies the allegations in Paragraph 82.

### Count IV:  Copyright Infringement

83.     NGIT incorporates by reference Paragraphs 1 through 31.

84.     NGIT does not respond to the allegations contained in Paragraph 84 because Count IV relates solely to NGC, which has filed a separate Answer.

85.     NGIT does not respond to the allegations contained in Paragraph 85 because Count IV relates solely to NGC, which has filed a separate Answer.

86.     NGIT does not respond to the allegations contained in Paragraph 86 because Count IV relates solely to NGC, which has filed a separate Answer.

87.     NGIT does not respond to the allegations contained in Paragraph 87 because Count IV relates solely to NGC, which has filed a separate Answer.

88.     NGIT does not respond to the allegations contained in Paragraph 88 because Count IV relates solely to NGC, which has filed a separate Answer.

89.    NGIT does not respond to the allegations contained in Paragraph 89 because Count IV relates solely to NGC, which has filed a separate Answer.

90.    NGIT does not respond to the  allegations contained in Paragraph 90 because Count IV relates solely to NGC, which has filed a separate Answer.

91.    NGIT does not respond to the allegations contained in Paragraph 91 because Count IV relates solely to NGC, which has filed a separate Answer.

92.    NGIT does not respond to the allegations contained in Paragraph 92 because Count IV relates solely to NGC, which has filed a separate Answer.

93.    NGIT does not respond to the allegations contained in Paragraph 93 because Count IV relates solely to NGC, which has filed a separate Answer.

94.    NGIT does not respond to the allegations contained in Paragraph 94 because Count IV relates solely to NGC, which has filed a separate Answer.

95.    NGIT does not respond to the allegations contained in Paragraph 95 because Count IV relates solely to NGC, which has filed a separate Answer.

96.    NGIT does not respond to the allegations contained in Paragraph 96 because Count IV relates solely to NGC, which has filed a separate Answer.

97.    NGIT does not respond to the allegations contained in Paragraph 97 because Count IV relates solely to NGC, which has filed a separate Answer.

98.    NGIT does not respond to the allegations contained in Paragraph 98 because Count IV relates solely to NGC, which has filed a separate Answer.

99.    NGIT does not respond to the allegations contained in Paragraph 99 because Count IV relates solely to NGC, which has filed a separate Answer.

100.    NGIT does not respond to the allegations contained in Paragraph 100 because Count IV relates solely to NGC, which has filed a separate Answer.

101.    NGIT does not respond to the allegations contained in Paragraph 101 because Count IV relates solely to NGC, which has filed a separate Answer.

102.    NGIT does not respond to the allegations contained in Paragraph 102 because Count IV relates solely to NGC, which has filed a separate Answer.

103.    NGIT does not respond to the allegations contained in Paragraph 103 because Count IV relates solely to NGC, which has filed a separate Answer.

## Count V:  Florida Trade Secrets Act

104.    NGIT incorporates by reference Paragraphs 1 through 31.  NGIT admits that Paragraph 104 summarizes the allegations in Count V, and otherwise denies the allegations in Paragraph 104.

105.    NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 105.

106.    NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 106.

107.    NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 107.

108.    NGIT admits that it downloaded ImagXpress, and otherwise denies the allegations in Paragraph 108.

109.    NGIT denies the allegations in Paragraph 109.

110.    NGIT admits that it is successor in interest to Integic, and otherwise denies the allegations in Paragraph 110.

111.    NGIT denies the allegations in Paragraph 111.

112.    NGIT denies the allegations in Paragraph 112.

113.    NGIT denies the allegations in Paragraph 113.

114.    NGIT denies the allegations in Paragraph 114.

### Count VI:  Florida Deceptive and Unfair Trade Practices Act

115.    NGIT incorporates by reference Paragraphs 1 through 31.  NGIT admits that Paragraph 115 summarizes the allegations in Count VI, and otherwise denies the allegations in Paragraph 115.

116.    Paragraph 116 asserts a legal conclusion as to which no response is required.

117.    Paragraph 117 asserts a legal conclusion as to which no response is required.

118.    NGIT denies the allegations in Paragraph 118.

119.    NGIT answers Paragraph 119 as follows:  As to the first sentence, NGIT lacks sufficient knowledge to admit or deny the allegations as to what "is believed" by Pegasus, and otherwise denies the allegations in that sentence.  As to the second sentence, NGIT admits that, based on Department of Defense reports, AHLTA has been deployed to  more than 100 MHS facilities; NGIT lacks sufficient knowledge to admit or deny what the DoD's future plans are as to AHLTA.

120.    NGIT admits that it is successor in interest to Integic, and otherwise denies the allegations in Paragraph 120.

121.    NGIT denies the allegations in Paragraph 121.

122.    NGIT denies the allegations in Paragraph 122.

123.    NGIT denies the allegations in Paragraph 123.

## Count VII:  Reverse Passing Off (Lanham Act)

124.    NGIT incorporates by reference Paragraphs 1 through 31.  NGIT admits that Paragraph 124 summarizes the allegations in Count VII, and otherwise denies the allegations in Paragraph 124.

125.    NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 125.

126.    NGIT lacks sufficient knowledge to admit or deny the allegations in Paragraph 126.

127.    NGIT admits that Paragraph 127 quotes a provision of the License Agreement, and otherwise denies the allegations in Paragraph 127.

128.    NGIT denies the allegations in Paragraph 128.

129.    NGIT denies the allegations in Paragraph 129.

130.    NGIT lacks sufficient knowledge to admit or deny the allegations as to what "is believed" by Pegasus or as to what the Department of Defense's future plans are with respect to AHLTA.  NGIT denies the remaining allegations if this Paragraph.

131.    NGIT admits that it is successor in interest to Integic, and otherwise denies the allegations in Paragraph 131.

132.    NGIT denies the allegations in Paragraph 132.

133.    NGIT denies the allegations in Paragraph 133.

134.    NGIT denies the allegations in Paragraph 134.

135.    NGIT denies the allegations in Paragraph 135.

## AFFIRMATIVE DEFENSES

FIRST AFFIRMATIVE DEFENSE:  Plaintiff fails to state a claim on which relief can be granted.

SECOND AFFIRMATIVE DEFENSE:  Plaintiff's claims are barred by accord and satisfaction.

THIRD AFFIRMATIVE DEFENSE:  Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands and plaintiff's own fault.

FOURTH AFFIRMATIVE DEFENSE:  Plaintiff's claims are barred by payment.

FIFTH AFFIRMATIVE DEFENSE:  Plaintiff failed to mitigate any damages.

SIXTH AFFIRMATIVE DEFENSE:  Plaintiff's claims are barred by the doctrine of laches.

SEVENTH AFFIRMATIVE DEFENSE:  Plaintiff's claims are barred by the doctrine of copyright misuse.

EIGHTH AFFIRMATIVE DEFENSE:  Plaintiff is not entitled to statutory damages under the Copyright Act, 17 U.S.C. 101 *et seq.*

NINTH AFFIRMATIVE DEFENSE:  Plaintiff's claims are barred by virtue of its own breach of the license agreement.

TENTH AFFIRMATIVE DEFENSE: Plaintiff's claims are barred in whole by the doctrine of anticipatory repudiation.

ELEVENTH AFFIRMATIVE DEFENSE:  NGIT hereby gives notice that it intends to rely upon any other defense that may become available or appear during the discovery proceedings in this case and hereby reserves its right to amend its Answer to assert any such defense.

## COUNTERCLAIM

Defendant-Counterclaimant Northrop Grumman Information Technology ("NGIT") alleges as follows:

### Nature of the Action

1.      This is a civil action seeking damages for breach of license under Florida law.

### The Parties

2.      NGIT is a global leader in advanced information technology, engineering, and business solutions.  NGIT is a Delaware corporation, with its principal place of business in Virginia, and is a wholly owned subsidiary of Northrop Grumman Systems Corporation ("NGSC"), which is, in turn, a wholly owned subsidiary of defendant Northrop Grumman Corporation ("NGC").  In May 2005, NGIT acquired Integic Corporation ("Integic"), a systems integrator that, among other things, helped governmental and commercial clients connect their legacy data systems to newer, more sophisticated technologies.  In December 2007, Integic was merged into NGIT.

3.      Plaintiff and Counterclaim-Defendant Pegasus Imaging Corporation ("Pegasus") is a developer of digital imaging software based in Tampa, Florida.  Among the products sold by Pegasus is ImagXpress, a "software toolkit" that enables software developers to create programs that can manipulate pictures and images.  ImagXpress is available for purchase on the Pegasus website and, when purchased, includes an accompanying "click-wrap" license agreement.

### Jurisdiction and Venue

4.      This Court has subject matter jurisdiction as to Pegasus's claims under 28 U.S.C. § 1331 because Pegasus brings claims under the Copyright Act, 17 U.S.C. § 101 *et seq.* and the Lanham Act, 15 U.S.C. § 1051 *et seq.*    Pursuant to 28 U.S.C. § 1367, this Court has

supplemental jurisdiction over the state law claim raised here because it arises out of the same alleged facts as those giving rise to Pegasus's federal law claims.

5.    The Court has personal jurisdiction over Pegasus (a) pursuant to Fla. Stat. § 48.193(1)(a) because Pegasus is operating, conducting, engaging in, or carrying on a business or business venture in this state and has an agency or office in this state; (b) pursuant to Fla. Stat. § 48.193(1)(g) because Pegasus breached contractual duties that it was required to perform in this state; and (c) pursuant to Fla. Stat. § 48.193(2) because Pegasus is engaged in substantial and not isolated activity within this state.

6.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) a substantial part of the events or omissions giving rise to the claims herein took part in this District; and (b) Pegasus has minimum contacts with the District and therefore is subject to personal jurisdiction in the District.

### AHLTA and the Development of a Drawing Tool

7.    The Armed Forces Health Longitudinal Technology Application is the United States military's electronic medical and dental clinical information system ("AHLTA"). AHLTA is a medical recordkeeping program that generates and maintains a life-long, computer-based patient record for our nation's service-members, veterans, and their families. AHLTA provides the doctors and nurses serving these communities the ability to access the medical and dental records of their patients worldwide and to update them in real-time.

8.    Beginning in 1997, the Department of Defense contracted with Integic to serve as the primary systems integrator responsible for developing and maintaining AHLTA. The federal government expected Integic to build AHLTA through a combination of commercially available products created by third-parties, and Integic's own custom programming.    Integic was

responsible for developing nearly every aspect of AHLTA. That responsibility shifted to NGIT when it acquired Integic in 2005 and then merged with Integic in 2007.

9.      In September 2003, the Department of Defense requested that Integic enhance AHLTA's capability by providing it with the ability to annotate images in patients' records – a function that is colloquially referred to as a "drawing tool." The drawing tool envisioned by the government would enable doctors and nurses to make handwritten notes on records, such as X-rays, for example, and then digitally share them with other military health facilities around the globe, thereby ensuring consistent care for service-members, veterans, and their families wherever they may be. The federal government expected that it would take Integic approximately five years to develop and integrate the drawing tool feature, and Integic was to be paid approximately $665,000 in total over that time period for its development.

**The ImagXpress License**

10.     On or about March 16, 2004, Integic downloaded one copy of an ImagXpress software development kit ("Toolkit") from Pegasus's website. As alleged above, ImagXpress comprises a set of tools that software developers, such as Integic, can use to develop in their own programs various imaging-related capabilities. Integic intended to use the tools provided in the ImagXpress Toolkit, in combination with its own custom programming, to develop the AHLTA drawing tool. The cost of the ImagXpress Toolkit, which Integic paid, was approximately $1,400.

11.     The ImagXpress Toolkit was accompanied by a boilerplate "click-wrap" license ("the License Agreement"), a copy of which Pegasus attached as Exhibit "A" to its Second Amended Complaint. The License Agreement grants licensees the right to use ImagXpress in two ways that are relevant here. First, it provides licensees the right to use the Toolkit in

ImagXpress to develop imaging capabilities in an entirely new piece of software, such as AHLTA. Second, the License Agreement also grants licensees the right to distribute to end-users pieces of ImagXpress (so-called "toolkit runtimes," or simply "runtimes") that are incorporated into the newly developed software. The two rights operate in tandem, as the right to use the ImagXpress Toolkit in the development stage would be virtually worthless without the right also to distribute the resulting runtimes as part of any software that the licensee creates.

12.     The License Agreement provides for broad software development rights. Any aspect of the ImagXpress Toolkit can be used in the development stage, so long as the Toolkit is used on only one computer at a time. Thus, if a licensee wants two developers to be able to use the Toolkit simultaneously, it must purchase two Toolkits. Accordingly, in February 2006, when Integic determined that it needed two of its in-house software developers to work on the drawing tool project simultaneously, it downloaded a second ImagXpress Toolkit. Once again, Integic agreed to the terms of the accompanying click-wrap license, and again paid Pegasus the $1,400 for that license.

13.     The runtime distribution right granted in the License Agreement is likewise broad. Licensees, such as Integic, are explicitly and unambiguously permitted under the License Agreement to distribute ImagXpress runtimes as a part of any software they develop. This distribution right is limited only inasmuch as the licensee's distribution of the newly developed software must comply with twelve conditions enumerated in the License Agreement. Certain of the conditions are technical; thus, for example, any software that includes ImagXpress runtimes may not be hosted on an intranet server or otherwise be part of a client-server solution. The License Agreement also imposes certain distribution limitations, which are designed to reserve to Pegasus the right to demand additional licensing fees in connection with exceptionally large

runtime distributions. Thus, the License Agreement provides that a software product containing ImagXpress runtimes cannot be distributed to more than 100,000 end-users, and that annual sales of the product cannot exceed $250,000. The License Agreement explicitly and unambiguously states that, so long as these and certain other conditions are met, a licensee is legally entitled to distribute ImagXpress runtimes as part of its software.

14.     At all times after downloading ImagXpress, Integic (and later NGIT) abided by all twelve of the runtime distribution conditions enumerated in the License Agreement.

## The Dispute over ImagXpress and its Removal from AHLTA

15.     By 2006, Pegasus was well aware of Integic's major clients and projects, including Integic's work on AHLTA for the federal government. Thus, with full knowledge that Integic already had spent more than two years using ImagXpress to develop a drawing tool in AHLTA, Pegasus decided to demand additional fees from Integic, over and above the $2,800 Integic already had paid. Pegasus calculated that, because Integic by then had invested so much time and money using Pegasus's product in the development of the AHLTA drawing tool, Integic would have little choice but to meet Pegasus's demands, notwithstanding that Integic had no contractual obligation to do so.

16.     Accordingly, in August 2006, a Pegasus sales representative contacted Integic, claiming that Integic was using ImagXpress in violation of the terms of the License Agreement. She demanded that Integic enter into negotiations to purchase what the License Agreement refers to as an "expanded direct license." According to the plain language of the License Agreement, such "expanded" licenses are required only when a licensee wishes to exceed one or more of the enumerated limitations stated in the Agreement. Integic had not done so. Indeed, at the time, Integic still was in the process of developing the drawing tool. Two versions of AHLTA

19

containing a rudimentary drawing tool, based in part on ImagXpress, had progressed by then to "beta" testing at a limited number of military health facilities, totaling perhaps 100 end-users. No version of AHLTA that contained any functional drawing tool built using ImagXpress had been – and to this day never has been – deployed to the field.

17.    Notwithstanding Integic's compliance with the existing License Agreement, Pegasus insisted, repeatedly and without justification, that Integic must pay for an expanded direct license. According to Pegasus's demands, such an additional license would require Integic to pay enormous quarterly fees based on the total number of AHLTA end-users. These "expanded" fees would have amounted to well in excess of $1,000,000 annually if AHLTA were ultimately released to the 80,000 end-users that the Department of Defense had estimated might be included in a final roll-out of the program.

18.    Even as Pegasus demanded that Integic must purchase an "expanded license," Integic was in compliance with the original License Agreement's conditions and limitations. In particular, annualized revenues from the drawing tool came nowhere close to exceeding $250,000 and, even at full deployment, AHLTA would not reach more than 100,000 end-users.

19.    In October and November 2006, Pegasus escalated its baseless demands that Integic begin paying more than was required under the License Agreement. Pegasus began threatening that Integic's use of ImagXpress in an AHLTA drawing tool – which still was only in beta testing – was now an "unlicensed" infringement of Pegasus's rights. Pegasus thus made repeated and unfounded demands that Integic must stop using ImagXpress immediately unless it agreed to Pegasus's proposed new expanded license.

20.    Because of the timetable requirements imposed upon Integic and NGIT under their program development agreements with the federal government, they were unable to enter

into a protracted licensing dispute with Pegasus that could risk jeopardizing the timely creation of a drawing tool for AHLTA. Accordingly, as a direct result of Pegasus's unjustified insistence that further use of ImagXpress constituted actionable infringement, Integic and NGIT immediately began working on an approach to disable ImagXpress in the versions of AHLTA being beta tested by the government. After successfully disabling ImagXpress, Integic and NGIT proceeded entirely to redesign the drawing tool functionality, using an alternate product, called Medcin, that was developed by a company called MediComp.

21. Because AHLTA was and is being developed on a fixed-price contract, neither Integic nor NGIT was permitted to bill the government for the Medcin toolkit, nor for any of the substantial amount of professional time that was spent disabling ImagXpress and redeveloping the drawing tool using Medcin. NGIT remains uncompensated for these expenses, which were directly caused by Pegasus's repudiation of its obligations under the License Agreement.

## Count I:  Breach of License

22. NGIT hereby re-alleges and incorporates by reference paragraphs 1 through 21 as if set forth herein.

23. This count is for breach of license against Pegasus.

24. On or about March 16, 2004 and February 24, 2006, Integic entered into click-wrap license agreements for ImagXpress that accompanied copies of the software downloaded from the Pegasus website.

25. Because Integic was merged into NGIT in December 2007, NGIT is now the successor-in-interest to Integic's rights and responsibilities under those license agreements.

26. Integic and NGIT abided by all the terms of the License Agreement and, as a result, had the right to distribute ImagXpress toolkit runtimes in AHLTA.

21

27.    In communications sent between August and November 2006, Pegasus made clear and unequivocal statements that it would treat Integic's and NGIT's use of ImagXpress as an infringement unless they paid additional amounts totaling hundreds of times more than the stated cost of ImagXpress.

28.    Pegasus's repeated, unambiguous statements that Integic's and NGIT's use of ImagXpress was unlicensed, combined with its demands for additional payment, constituted a definite and unconditional repudiation of the original License Agreement, which, in turn, constituted a breach of that agreement.

29.    As a direct result of Pegasus's breach of the License Agreement, Integic and NGIT suffered substantial damages on account of the need to redesign the drawing tool in AHLTA.  The damages suffered include, but are not limited to, the cost of purchasing a replacement toolkit from Medicomp and the labor and management time required both to disable and replace the Pegasus software in AHLTA, all in amounts to be proven at trial.

WHEREFORE, Defendant-Counterclaimant NGIT requests judgment against Pegasus for all damages available, plus fees, costs, prejudgment interest, and such other relief as the Court may deem appropriate.

Respectfully submitted,

/s/ Gary A. Orseck
Gary A. Orseck (Admitted *pro hac vice*)
Ariel N. Lavinbuk (Admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411L
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510
gorseck@robbinsrussell.com
*Lead Counsel for Defendants*


Lawrence B. Lambert
Fla. Bar No. 0032565
LASH & GOLDBERG LLP
Bank of America Tower, Suite 1200
100 S.E. 2nd Street
Miami, Florida 33131
PH: (305) 347-4040; Fax: (305) 347-4050
llambert@lashgoldberg.com
September 18, 2009                 *Local Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 18, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of the electronic filing to the following: David D. Ferrentino, Esq., David Forziano, Esq., Donald W. Stanley, Jr., Esq., and Richard Anthony Harrison, Esq., counsel for Plaintiffs.

/s/ Lawrence B. Lambert
Lawrence B. Lambert
Fla. Bar No. 0032565
*Local Counsel for Defendants*
**LASH & GOLDBERG LLP**
Bank of America Tower, Suite 1200
100 S.E. 2nd Street
Miami, Florida 33131
PH: (305) 347-4040
Fax: (305) 347-4050
llambert@lashgoldberg.com

23