UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Tampa Division

|  |  |
|---|---|
| PEGASUS IMAGING CORPORATION, a Florida Corporation | ) ) ) ) |
| Plaintiff and Counterclaim-Defendant, | ) ) ) ) ) |
| v. | ) ) ) |
| NORTHROP GRUMMAN CORPORATION, a Delaware Corporation | ) ) ) ) ) |
| Defendant, and | ) ) ) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION, a Delaware Corporation | ) ) ) ) ) |
| Defendant and Counterclaimant. | ) ) ) |

Case No. 8:07-cv-01937-T-27EAJ

DEFENDANT NORTHROP GRUMMAN SYSTEMS CORPORATION'S MOTION FOR
SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Lawrence B. Lambert
Fla. Bar No. 0032565
LASH & GOLDBERG LLP
Bank of America Tower, Suite 1200
100 S.E. 2nd Street
Miami, FL 33131
Telephone: (305) 347-4040
Fax: (305) 347-4050
llambert@lashgoldberg.com

September 13, 2010

/s/ Gary A. Orseck
Gary A. Orseck (Admitted *pro hac vice*)
Ariel N. Lavinbuk (Admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411L
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510
gorseck@robbinsrussell.com

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................2

BACKGROUND.................................................................................................4

    A.  NGIT's Development Of An Electronic Medical Record System........................4

    B.  Pegasus, ImagXpress, And The Development Of A Drawing Tool .......................6

    C.  The Dispute Over ImagXpress ..........................................................8

    D.  The Removal Of ImagXpress From AHLTA ......................................9

ARGUMENT ...................................................................................................11

    I.  NGIT IS ENTITLED TO JUDGMENT ON COUNT I (BREACH OF LICENSE).......11

    A.  The Development License Granted NGIT The Right To Use ImagXpress For "Development Purposes," And A Separate "Runtime Distribution" License Would Have Been Required Only If NGIT Distributed A Product That Actually Used ImagXpress Components To Provide Features To End Users ..................12

    B.  NGIT Used ImagXpress For "Development Purposes" Only, And Made No Distribution Of Any Product That Used ImagXpress Components....................15

    II.  NGIT IS ENTITLED TO SUMMARY JUDGMENT ON PEGASUS'S COPYRIGHT INFRINGEMENT CLAIMS (COUNTS II AND III)................................21

    III.  NGIT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V ...........22

    IV.  NGIT IS ENTITLED TO SUMMARY JUDGMENT ON PEGASUS'S FDUTPA AND LANHAM ACT CLAIMS (COUNTS VI AND VII)......................23

CONCLUSION .................................................................................................25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allapattah Services, Inc.* v. *Exxon Corp.*, 61 F. Supp. 2d 1308 (S.D. Fla. 1999)............................. 14, 17

*Border Collie Rescue, Inc.* v. *Ryan,* 418 F. Supp. 2d 1330 (M.D. Fla. 2006).........................................23

*Cornerstone Home Builders, Inc.* v. *McAllister*, 311 F. Supp. 2d 1351 (M.D. Fla. 2004)....................22

*Croll-Reynolds Co.* v. *Perini-Leavell-Jones-Vinell,* 399 F.2d 913 (5th Cir. 1968) ...............................16

*Custom Mfg. and Eng'g, Inc.* v. *Midway Servs., Inc.*, No. 803CV2671T30,
        2005 WL 1313829 (M.D. Fla. May 31, 2005), *aff'd* 508 F.3d 641 (11th Cir. 2007).........24

*Dastar Corp.* v. *Twentieth Century Fox Film Corp.*, 523 U.S. 23 (2003)..................................................24

*Frehling Enters., Inc.* v. *Int'l Select Group, Inc.*, 192 F.3d 1330 (11th Cir. 1999)................................24

*Freyburger LLC* v. *Microsoft Corp.*, No. 09-cv-104, 2009 WL 3062884
        (W.D. Wis. Sept. 21, 2009)...........................................................................................................14

*Knickerbocker Toy Co., Inc.* v. *Azrak-Hamway Intern., Inc.*, 668 F.2d 699 (2d Cir. 1982)................22

*Lewis* v. *Dep't of Health & Rehab. Servs.*, 659 So. 2d 1255 (Fla. Dist. Ct. App. 1995).......................18

*M.G.B. Homes, Inc.* v. *Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990) ....................................25

*Macias* v. *HBC of Florida, Inc.*, 694 So. 2d 88 (Fla. Dist. Ct. App. 1997) ............................................25

*Mason* v. *Montgomery Data, Inc.*, 967 F.2d 135 (5th Cir. 1992)...........................................................22

*McIntosh* v. *Hough*, 601 So. 2d 1170 (Fla. 1992) .....................................................................................18

*NCP Lake Power, Inc.* v. *Florida Power Corp.*, 781 So. 2d 531 (Fla. Dist. Ct. App. 2001)................14

*North Am. Clearing, Inc.* v. *Brokerage Computer Systems, Inc.*, 666 F. Supp. 2d 1299
        (M.D. Fla. 2009).............................................................................................................................24

*Oravec* v. *Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148 (S.D. Fla. 2006) .........................21

*PHA Lighting Design, Inc.* v. *Kosheluk*, No. 1:08-cv-01208, 2010 WL 1328754
        (N.D. Ga. Mar. 30, 2010).............................................................................................................25

TABLE OF AUTHORITIES — continued

<u>Page(s)</u>

*Quinn* v. *City of Detroit*, 23 F. Supp. 2d 741 (E.D. Mich. 1998) ...................................................... 18, 21

*Ringgold* v. *Black Entm't Television, Inc.*, 126 F.3d 70 (2d Cir. 1997) ...................................................21

*Trandes Corp.* v. *Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir. 1993).......................................................23

<u>Statutes</u>

17 U.S.C. § 412.....................................................................................................................................22

28 U.S.C. § 1498(b) .............................................................................................................................16

Defendant Northrop Grumman Systems Corporation ("NGSC") hereby moves for summary judgment, pursuant to Fed. R. Civ. P. 56 and the Court's September 8, 2010 Order (Dkt. 129), and states as follows:

1.   Count I alleges that NGSC breached its license with Pegasus Imaging Corporation ("Pegasus"), when the government distributed copies of a NGSC program called AHLTA, which included in it non-functional components of Pegasus's ImagXpress software.  The record is undisputed that, as permitted under the license, ImagXpress components were included in AHLTA only in the development of a drawing tool feature that was never finished or deployed to end-users.

2.   Counts II and III allege that NGSC's breach constitutes direct and secondary copyright infringement.  Those claims fail because NGSC did not exceed the scope of the license, and because Pegasus alleges at best an insignificant infringement.  In any event, NGSC is entitled to summary judgment as to Pegasus's claims for statutory damages and attorneys' fees because Pegasus did not register its copyright for ImagXpress until after it alleges that NGIT commenced its infringement.

3.   NGSC is entitled to summary judgment on Pegasus's Florida Trade Secrets Act claim (Count V) because the record is devoid of evidence that NGSC "accessed or obtained" and "distributed" Pegasus's trade-secret source code (Dkt. 60 ¶ 108, 119).

4.   NGSC is entitled to summary judgment on Pegasus's Florida Deceptive and Unfair Trade Practices Act and the Lanham Act claims (Counts VI and VII) because there is no evidence of any "consumer confusion" – an element that is required for both claims.

WHEREFORE, defendant NGSC respectfully moves the Court for summary judgment as to Counts I, II, III, V, VI, and VII of the Second Amended Complaint.

## MEMORANDUM OF LAW

"AHLTA" – the Armed Forces Health Longitudinal Technology Application – is the Defense Department's electronic health-record system.   AHLTA provides 77,000 healthcare providers throughout the Military Health System ("MHS" or "the field") with access to the medical records of millions of active and retired service members and their families.  In 2003, the Defense Department asked Integic Corporation (later acquired by Northrop Grumman Information Technology ("NGIT")), AHLTA's systems integrator, to develop a "drawing tool" feature in AHLTA to allow healthcare providers to annotate patient records on their computers.[1]  To assist in the development of that feature, NGIT evaluated several off-the-shelf software packages.  Because NGIT had a fixed-price contract with the Defense Department (and thus could not pass along the cost of third-party software licenses), it was essential to NGIT that any fees incurred be both fixed and reasonable.

One of the options NGIT evaluated was Pegasus's "ImagXpress" toolkit.  ImagXpress came with a $1,499 "development" license, which permits the licensee to use the toolkit to create imaging features in the licensee's derivative product.  In late 2003, an NGIT software developer called the President of Pegasus, Jack Berlin, to ask about Pegasus's licensing scheme.  Berlin confirmed that, in addition to the development license, NGIT could purchase a separate "runtime distribution" license – for a flat fee of $9,985 – that would cover NGIT's unlimited *distribution* of any derivative application that contained ImagXpress components.  On the basis of that representation, NGIT finalized its contract with the government to develop the drawing tool.

In 2006, with the drawing tool feature still under development, a brand new Pegasus sales representative was assigned to the NGIT account.  She contacted NGIT and advised that licensing

---

[1]  Unless otherwise noted, all references to NGIT in this brief refer to Integic, NGIT, and NGSC.

would be entirely different from what NGIT had understood.  First, contrary to all previous assurances, the runtime distribution license would now be assessed on a per-installation basis (rather than a fixed fee).  And second, even though the drawing tool was only in the testing phase, she insisted that NGIT had to purchase a runtime distribution license *now*, or be in breach. Given that NGIT expected there to be thousands of healthcare providers using AHLTA's drawing tool, the cost to NGIT of a per-installation runtime distribution license would be dramatically higher than what NGIT had been led to believe when it selected ImagXpress.

Immediately concluding that the proposed new arrangement was impracticable, NGIT promptly took steps to replace ImagXpress with a competitor's product.  As a consequence, although NGIT had initially used ImagXpress to help *develop* a drawing tool (for which NGIT had purchased a development license), no version of AHLTA that contained an actual ImagXpress-based drawing-tool feature ever was *distributed* to any healthcare providers.

Thus scorned, Pegasus brought this suit seeking millions of dollars in supposed lost "runtime distribution" royalties – notwithstanding that no drawing tool using ImagXpress ever was used by anyone.  Lacking any legitimate theory that NGIT made an unlicensed "runtime distribution" of ImagXpress, the thrust of Pegasus's claim is this:  NGIT delivered to the government a version of AHLTA ("Build 838") that included non-functional components of ImagXpress which were placed in Build 838 as a necessary step in developing a drawing tool for distribution in *future* versions of AHLTA ("Build 841" and "Release 3.3").  Pegasus claims that, when the government distributed Build 838 to the field – containing non-functional ImagXpress components – NGIT committed an unlicensed "runtime distribution" of Pegasus software.  Based upon that theory, Pegasus claims that NGIT breached the development license, infringed Pegasus's copyrights, and violated the Florida

3

Trade Secrets Act, the Florida Deceptive and Unfair Practices Act, and the Lanham Act.

None of Pegasus's claims presents a triable issue of fact. Pegasus concedes that NGIT purchased two development licenses, which permitted NGIT to develop a drawing tool using ImagXpress. At the same time, because no version of AHLTA containing a drawing tool (or any other feature) using ImagXpress ever was distributed to end users, NGIT did not breach the development license, was not required to purchase a separate "runtime distribution" license, did not infringe Pegasus's copyrights, and did not commit any of the other torts with which it has been charged.

## BACKGROUND

### A.    NGIT's Development Of An Electronic Medical Record System

The federal government chose Integic as its primary "systems integrator" at the outset of the AHLTA program in 1999.[2] Exhibit ("Ex.") JJ at 90:24-91:11. As an integrator, NGIT was not expected to write all the code for AHLTA from scratch; rather, it combined its own custom programming with consumer-off-the-shelf ("COTS") products, often referred to as software development kits ("SDKs" or "toolkits"). Ex. NN at 18:14-20; Ex. A ¶ 2.

The development of each new feature for AHLTA proceeded through four general stages. In Stage 1, the "software requirements review," the technical specifications of the new feature would be defined and a delivery order would be signed by NGIT and the government. Ex. LL at 91:25-92:5. In Stage 2, NGIT software developers would write "source code" for the feature, a set of computer instructions that may link to, or "call up," a software routine taken from a third-party toolkit component. *Id.* at 92:6-11. In Stage 3, the source code and any necessary toolkit components would be integrated into the AHLTA program and tested by NGIT to ensure that everything fit together. *Id.*

---

[2]  Integic was acquired by NGIT, a second-level subsidiary of Northrop Grumman Corporation, in 2005. Ex. B. In December 2007, the two merged. Ex. C. In December 2009, NGIT was merged into its immediate parent, NGSC, which is now the named defendant. See Ex. D; Dkt. 109. See *supra* n.1.

4

at 92:12-16.  "At that point, the software was handed over to . . . the government."  *Id.* at 92:25-93:2.

After delivery, in Stage 4, the government would perform its own testing.  On one track, called Developmental Testing and Evaluation ("DT&E"), an independent vendor would ensure that the software functioned without bugs or errors.  *Id.* at 93:6-8.  On the second track, called "beta testing," the software would be tested by actual healthcare providers at a handful of MHS facilities.  *Id.* at 93:9-18.  Only in those instances where the new feature successfully passed both tracks of testing did the government consider releasing it for eventual distribution to end users, a step known as "Promotion to the Field."  *Id.* at 93:19-25.  See Ex. NN at 33:5-34:14.  In the vast majority of instances, the software never reached this final step because problems during testing required "the whole software development life cycle [to] start over."  Ex. LL at 95:3-13.  See also Ex. NN at 37:19-40:2.  As numerous witnesses testified, the development cycle described above is a "standard methodology used in all kinds of software development projects."  Ex. LL at 107:21-23.  See also Ex. NN at 28:9-29:7; Ex. KK at 69:6-10; Ex. PP at 43:5-48:3.

Because new features were constantly being requested by the government and developed by NGIT, there was no single version of AHLTA.  Ex. NN at 40:3-41:7.  Rather, once some number of new features successfully passed the first three stages of development, NGIT would deliver AHLTA to the government for Stage 4 testing and possible Promotion to the Field.  *Id* at 30:1-12.  That delivery would be assigned a version number (called a "build" or "release").  *Id.* at 37:4-14.  Because different features were requested at different times, and because the time required to develop them differed, every version of AHLTA delivered to the government necessarily included not-yet-functional computer code and components relating to untested features that the government planned to roll out

in a future version.[3]  Ex. MM at 133:2-134:25.  In those instances, these non-functional elements would be hidden behind a "switch," so that an end user could neither see nor use them until the government had approved for Promotion to the Field a version of AHLTA containing the new feature. *Ibid.*; Ex. LL at 27:4-22; 55:23-56:21.

> **B.**  **Pegasus, ImagXpress, And The Development Of A Drawing Tool**

In 2003, the government requested that NGIT add a new drawing tool feature to AHLTA. Ex. A ¶ 11; Ex. E.  Joe Longo, an NGIT developer, began researching third-party toolkits for use in developing the new feature.  Ex. OO at 46:11-20.  Longo identified six substantially similar toolkits, and noted the pros and cons of each on a spreadsheet that he shared with everyone working on AHLTA.  *Ibid.*  Each of these toolkits came with a "development license" – which allowed the licensee to use the toolkit to develop new features in the software – that cost less than $2,000.  Ex. F.

Among the issues Longo considered was the additional cost (that is, beyond the development-license cost) of obtaining so-called "runtime distribution" rights, which allow the licensee to distribute its own derivative computer program (in this case, AHLTA) that includes one or more software features built using the licensor's toolkit.  *Ibid.*  For two reasons, NGIT considered only those vendors that were prepared to offer unlimited runtime distribution for a fixed fee – as opposed to a fee based upon the number of copies distributed or installed.  Ex. JJ at 123:11-14.  First, NGIT had no control over how many copies of AHLTA the government might make once a given version was Promoted to

---

[3]  AHLTA comprises approximately 3.2 million lines of source code that make up nearly 400 different project files, each of which includes dozens of features.  Ex. XX at 5.  Although every version of AHLTA is "built off of the same starting point" of source code, not every feature is in the same stage of development at the same time; some may be ready for deployment while others are still being written or tested.  Ex. NN at 40:5-8.  A consequence of this development process is that, at various points along the way, code is "truncate[d]" and broken-off for delivery as one version, even as the underlying code continues to be developed – and new features are added – for release as future versions.  *Id.* at 40:13. Indeed, "you could have at some point multiple break-offs of the same base code that are being changed at the same time" for delivery as different versions with different features.  *Id.* at 40:18-21.

the Field.  Ex. LL at 62:7-11; Ex. RR at 30:12-24; 37:4-6.  Second, AHLTA delivery orders typically were fixed-price contracts, meaning that NGIT generally could not pass any incremental licensing costs to the government.  Ex. A ¶ 8.  Thus, if a runtime distribution license imposed a per-installation cost, NGIT might end up paying more in licensing fees than the value of the feature provided.[4]

During his evaluation process, in September 2003, Longo emailed Pegasus's President, Jack Berlin, whose ImagXpress toolkit included some of the features NGIT required.  Ex. K.  Longo told Berlin that NGIT was developing AHLTA (then known as "CHCSII") for the military, and estimated that the software might reach 25,000 users.  *Ibid.*  He asked Berlin to confirm that Pegasus would "honor the unlimited distribution for this application for $9985 – the terms listed on [the Pegasus] web site."  *Ibid.*  Berlin confirmed that "Pegasus will grant the DOD an unlimited distribution right for ImagXpress Professional v6 within the CHCSII application for $9,985" (*ibid.*), which Longo recorded on his spreadsheet as $10,000 (Ex. F).  On the strength of that representation, Longo began developing a prototype of the drawing tool using ImagXpress (Shen. Tr. 58:10-13; *id.* at 276:15; Ex. G), and NGIT included the quoted delivery price of $10,000 in the delivery order it signed with the government.  Ex. A ¶ 14.  Based upon NGIT's description of the work required, the government agreed to pay NGIT approximately $665,000 to develop the drawing tool feature.  *Id.* at ¶ 15.

After the delivery order was signed, a different NGIT developer, Jane Shen, reached out to Pegasus to reconfirm what Longo had been told about pricing.  Ex. OO at 192:2-194:14 (discussing Ex. EE); 231:17-232.  Pegasus Vice President of Sales Russ Puskaric told Shen that a newer version of ImagXpress – version 7 – was now available, and that the cost of runtime distribution licensing for

---

[4]   In instances where the government determined that a particular third-party product was essential to AHLTA's functionality, the government would procure the necessary licensing itself and would, on occasion, agree to per-installation distribution costs.  See, *e.g.*, Ex. JJ at 129:23-130:19.

version 7 could depend upon the value of the product being developed by NGIT.  Ex. OO at 232:4-24; 236:19-237:21 (discussing Ex. M).  Puskaric also confirmed that Pegasus would charge NGIT "one flat fee" for unlimited runtime distribution licensing (*id.* at 233:18-234:22), but said nothing that would lead Shen to believe that the cost of such licensing would be materially different from the $9,985 that Longo had been quoted (*id.* at 199:5-200:21).  See also *id.* at 238:1-2 (Puskaric told Shen that runtime distribution cost was "one flat fee [with] fixed costs.").  Accordingly, Shen asked her supervisors to purchase a license (the "Development License") (Ex. Y) from Pegasus, and she began developing a drawing tool using ImagXpress.  Ex. OO at 238:20-23.

Over the next two years, NGIT developers used ImagXpress to begin developing and testing the new drawing tool feature.  *Id.* at 239:15-25.  Though NGIT was developing a version of AHLTA known as "Build 838" when Shen began her work in 2004, various project delays pushed back the government's expected receipt of the drawing tool to a later version of AHLTA.  Ex. A ¶ 16.  In February 2006, NGIT downloaded and paid for a second development license, so that two developers could work on the project at once.  Ex. N.  At no point did Pegasus communicate to NGIT any change in its runtime distribution licensing scheme.  Ex. OO at 239:9-14; Exs. O, P, and Q.

### C.    The Dispute Over ImagXpress

In July 2006, a new Pegasus sales representative assigned to NGIT, Irma (Delgado) Beecher, made a courtesy call to Kenneth Amos, who was responsible for NGIT's licenses with toolkit developers.  Ex. GG at 41:10-18; 46:9-19.  Amos reminded Beecher that NGIT had licensed ImagXpress for use in AHLTA – precisely the same information communicated by Joe Longo to Jack Berlin in 2003, and by Jane Shen to Russ Puskaric in 2004 – and Beecher responded by requesting more information about AHLTA.  *Id.* at 50:19-51:17.

8

On August 18, 2006, Beecher and Puskaric called David Dundon, the AHLTA Program Manager at NGIT, and Jerry Jennings, an NGIT Contracts Manager, and announced that NGIT was obligated to purchase a runtime distribution license, a proposed version of which Beecher sent Dundon and Jennings after the call. *Id.* at 64:23-65:2 (referencing Exs. R and S). Contrary to what NGIT had been promised by Pegasus, the proposed new license contemplated a per-installation fee to be paid quarterly, plus mandatory annual "service and support fees." Ex. SS at 182:4-185:14. Under the proposed license, were the government to deploy a version of AHLTA containing Pegasus features to 100,000 computers, the runtime distribution fee, including annual support fees, would have been hundreds of thousands of dollars – nearly the total amount ($665,000) that NGIT was to be paid for developing the drawing tool. Ex. TT at 20. Hours after concluding the call with Beecher and Puskaric, Dundon emailed his team at NGIT to relay that NGIT could not go forward with Pegasus: "Unbelievable. How quickly can we rip it out and insert a substitute?" Ex. JJ at 180:17-181:15 (discussing Ex. T). NGIT then mobilized to determine how best to disengage from Pegasus without violating its obligations to the military.

D.    The Removal Of ImagXpress From AHLTA

When Beecher and Puskaric first demanded in August 2006 that NGIT purchase a per-installation runtime distribution license, three major versions of AHLTA were in various stages of the development pipeline: (i) Build 838, (ii) Build 841, and (iii) Release 3.3.

AHLTA Build 838, which was first delivered to the government on December 22, 2004, contained no drawing tool or any other feature that relates in any way to ImagXpress or Pegasus. See *infra* p. 16. Build 838 did, however, include certain components from the ImagXpress toolkit because of work that was in progress toward including a drawing tool feature based upon ImagXpress in Build

9

841.  See *supra* n.3.  As explained above (*supra* p. 5), the code for the nascent drawing tool, and the related ImagXpress components, were hidden behind a switch, so that no user of Build 838 could have known they were there, let alone used them.  The government eventually approved some versions of Build 838 for Promotion to the Field.  Ex. NN at 88:5-16; 138:22-139:6; 144:18-146:6.

In the fall of 2006 (when the dispute with Pegasus erupted), Build 841 was entering Stage 4 testing.  Unlike Build 838, Build 841 *did* contain a usable drawing tool feature based upon ImagXpress.  Ex. RR at 47:19-49:5.  In the aftermath of Pegasus's August 2006 demands for a per-installation distribution license, however, NGIT installed a switch in Build 841 that removed the drawing tool feature.  Ex. JJ at 229:19-21.  No version of Build 841 ever was approved for Promotion to the Field in any case.[5]  Ex. NN at 41:15-42:2; 96:14-21.

As Build 838 was being considered for Promotion to the Field and Build 841 was proceeding through DT&E and beta testing, the government instructed NGIT to begin developing yet another, newer version of AHLTA known as Release 3.3.  Recognizing that NGIT and Pegasus were not going to resolve their disagreement over the runtime distribution license, in February 2008, NGIT developed a *new* drawing tool for Release 3.3 using software from a different company, called Medicomp.  Ex. LL at 39:3-11; Ex. A ¶ 17.  NGIT first delivered Release 3.3 to the government on March 7, 2007 (Ex. W), and on September 24, 2009, after completing DT&E and beta testing, the government approved for Promotion to the Field a version of it called Release 3.3.3.2.  Ex. NN at 109:13-18.  Release 3.3.3.2, which relies upon Medicomp software, and contains no ImagXpress components whatsoever, already has replaced Build 838 on more than 70,000 government machines and is

---

[5]  NGIT also delivered versions of AHLTA known as Build 839, 840, and 843 to the government, but like Build 841, none was ever approved for Promotion to the Field.  Ex. NN at 110:7-14.

10

scheduled to replace it entirely by year's end.  Ex. NN at 160:1-161:9 (discussing Ex. X).  In sum, as a result of Pegasus's demand that NGIT was obligated to purchase a per-installation runtime distribution license, NGIT shut down its use of ImagXpress before any ImagXpress-based drawing tool had been distributed to the field in any version of AHLTA.

## ARGUMENT

### I.  NGIT IS ENTITLED TO JUDGMENT ON COUNT I (BREACH OF LICENSE)

Both parties agree that NGIT purchased from Pegasus a Development License (which allowed it to use ImagXpress "for development purposes"), but that NGIT did *not* purchase a separate runtime distribution license (which allows the licensee to make a "redistribution of toolkit runtimes").  In its breach-of-contract claim, Pegasus alleges that NGIT exceeded the terms of its Development License and strayed into the realm of "runtime distribution," for which a separate license was required.

As if to suggest that the government distributed to the field a version of AHLTA that included features that used ImagXpress components, Pegasus alleges (Dkt. 60 ¶ 89) that its software is an "integral component" of AHLTA.  To whatever extent Pegasus is actually claiming that any user of AHLTA ever actually used any ImagXpress-based feature, there is zero evidence of it; certainly none of Pegasus's fact or expert witnesses contends that any feature that used ImagXpress components was available in any version of AHLTA that was distributed to the field.  Instead, Pegasus's theory is that the mere presence of non-functional ImagXpress components in certain versions of AHLTA that *were* distributed to the field amounts to an unauthorized "redistribution of toolkit runtimes."

That is wrong.  The presence of unusable ImagXpress components in early versions of AHLTA was an incident of the development process (a process that was scrapped as soon as Pegasus insisted that NGIT was obligated to purchase an enormously expensive "runtime" license), and

11

therefore was permitted under NGIT's Development License.  By the same token, there never was any "redistribution" of ImagXpress "runtimes" because the ImagXpress code never could actually "run."

To demonstrate why Pegasus's breach claim fails as a matter of law, we first set out the terms of the Development License (Subsection A, below), and than show that NGIT's activities fell squarely within those terms (Subsection B).

A.   **The Development License Granted NGIT The Right To Use ImagXpress For "Development Purposes," And A Separate "Runtime Distribution" License Would Have Been Required Only If NGIT Distributed A Product That Actually Used ImagXpress Components To Provide Features To End Users**

1.  The Development License (Ex. Y) has two sections.  The first section provides the licensee "the right to use one copy of a properly registered Pegasus Development Toolkit ('TOOLKIT') for development purposes on any single computer."  "Using" the toolkit for development purposes means writing source code that "calls up" one or more routines or components in the toolkit, which are placed in the derivative work the licensee is creating.[6]  Suppose, for example, that an existing version of AHLTA is composed of one thousand files.  A developer working to add a drawing tool to a later version might add five files (or "components") from a software development toolkit (such as ImagXpress), and then write new source code linking together the five new files with the one thousand original ones, thus enabling the new version of AHLTA to take advantage of the new files.  While this is process is underway, the drawing tool is said to be a "derivative work-in-progress."  Ex. KK at 139:6-9.  The Development License provides that any component of the ImagXpress Toolkit can be used for development, so long as the toolkit is used on only one computer at a time.  While the Development License restricts use of the toolkit to one computer at a time, it places no such restriction on the

---

[6]   See Ex. WW at 9 ("The toolkit, operating on a developer's computer, typically enables the developer to combine software building blocks included in the toolkit with new and original instructions created by that developer to form a new component of software . . . which is separate and distinct from the original toolkit").

number of works-in-progress that can be made as part of the development process.

The scope of the term "development purposes" is not defined in the Development License, but both sides' software licensing experts agree that "development" is a broad term that encompasses numerous activities. See, *e.g.*, Ex. WW at 4-13; Ex. PP at 39:20-43:4. It includes not only the writing of code and the linking of toolkit components into a derivative work-in-progress, but the compiling and testing of that work internally, as well as third-party testing for both stability and usability (*i.e.*, beta testing). See Ex. WW at 5-9; Ex. KK at 136:17-137:17 (testing), 138:6-139:2 (writing code and linking components); Ex. PP at 43:13-15 (writing code), 52:5-12 (testing); 55:2-8 (testing).[7]

2.  The second portion of the Development License (entitled "REDISTRIBUTION OF TOOLKIT RUNTIMES") authorizes the licensee to "distribute or transfer limited copies of TOOLKIT runtimes" so long as the licensee abides by twelve enumerated conditions, all of which are generally intended to cover smaller-scale uses. Ex. HH at 199:16-200:17. The phrase "TOOLKIT runtimes" is not defined in the Development License, but both sides' experts have explained that it refers to software that is actually used in some fashion, or that performs some function, in the licensee's derivative product. In the words of Pegasus's expert, Robert Sherwood, a "runtime" "helps [the derivative product] do whatever you've designed it to do." Ex. PP at at 125:16-17. "[A] runtime would be something that you . . . use [in] your application, to make your application go," and "hence, the term runtime." *Id.* at 124:22, 125:7-10. NGIT's expert, Don Jarrell, likewise explains that a "redistribution of TOOLKIT runtimes" occurs at "the point at which the work product of the

---

[7]  Numerous fact witnesses testified to the same effect, including third parties with considerable experience in the commercial and governmental software industries. See, *e.g.*, Ex. MM at 133:12-17 ("the software development process includes both the active writing [of] source code as well as testing, integrating, [and] perhaps beta testing with end users"); Ex. NN at 28:9-:29:7; Ex. LL at 91:21-107:23.

development effort is declared to be released for reproduction and delivery . . . with [a] certain functionality and feature set, to the customer." Ex. KK at 124:9-15.  In short, there is consensus between the experts that "redistribution" of a "TOOLKIT runtime" occurs only when a software product or feature that actually uses ImagXpress for its intended purpose is distributed to end users.  If the toolkit component is simply placed in the application but does not run or execute, then no toolkit runtime has occurred.  See *Freyburger LLC* v. *Microsoft Corp.*, No. 09-cv-104, 2009 WL 3062884, at *2 (W.D. Wis. Sept. 21, 2009) ("runtime" is when a component is "used").  The Development License allows the licensee to make such a "redistribution of runtimes," but only if the enumerated conditions are met.  In the event those conditions "cannot be complied with . . . then LICENSEE shall obtain an expanded direct license from PEGASUS for derivative works."

3.   The division of a licensee's rights as between "development," on the one hand, and "redistribution of runtimes," on the other, tracks both standard business practice and common sense. See *Allapattah Services, Inc.* v. *Exxon Corp.*, 61 F. Supp. 2d 1308, 1315 (S.D. Fla. 1999) ("Parties to a contract . . . are presumed to have intended the incorporation of trade usage in striking their bargain.") (citation omitted); *NCP Lake Power, Inc.* v. *Florida Power Corp.*, 781 So. 2d 531, 537 (Fla. Dist. Ct. App. 2001) ("language used should be interpreted as reasonable persons, knowledgeable about the business or industry, would likely interpret them") (citation omitted).  As Pegasus President Jack Berlin explained, the functionality provided in ImagXpress is "in very raw form" and "not ready to use" out of the box.  Ex. HH at 101:3-4.  Thus, by purchasing a Development License, a company obtains the right to experiment with the toolkit, write source code, and test it with potential customers. That experimentation happens in the context of a development cycle that often "never ends" because, as Pegasus's expert explained, licensees with sophisticated products, like AHLTA, are "continually

developing [them] and releasing different versions" that update existing features or introduce new ones. Ex. PP at 49:9-22.  It follows that the right to use the toolkit as part of the development process necessarily includes the right to include toolkit components in a derivative "work-in-progress," so long as the components are not in the functional form that would render them "TOOLKIT runtimes."  If that right were *not* granted, then from the moment a licensee inserted ImagXpress components in its product to begin the development of a new ImagXpress-based feature, that licensee would be unable to release new versions of its product that merely update or introduce features that have *nothing* to do with ImagXpress.  That would nonsensically force a licensee to negotiate a runtime distribution license before it knew whether it ever could successfully develop the new ImagXpress-based feature, let alone test it or take it to market.  See Ex. WW at 9-11; Ex. KK at at 124:1-5 ("[I]f Pegasus is in this business, they've got to know that sometimes people develop software and they don't release it and so no distribution license is required and no royalties are owed").  See also Ex. TT at 11-12.

To be sure, when it becomes clear that a feature that actually uses the licensor's software will be made commercially available, a runtime distribution license may be required.  Ex. WW at 10.  "The term 'distribution' in this sense carries with it the commercial condition that a product . . . has been offered and delivered to a customer for payment of money or other consideration."  *Ibid.*  See also Ex. MM at 132:10-23 (industry practice is that a runtime distribution occurs once a functioning product "begins to be deployed and used by actual physicians and nurses").  As we next show, no such "distribution" ever occurred, and thus NGIT never ran afoul of the Development License.

### B.  NGIT Used ImagXpress For "Development Purposes" Only, And Made No Distribution Of Any Product That Used ImagXpress Components

When Pegasus demanded in August 2006 that NGIT purchase a per-installation runtime distribution license, three versions of AHLTA were in various stages of the development pipeline, and

all three contained ImagXpress components.[8]  Rather than fight with Pegasus over its newly minted reading of the Development License, NGIT took immediate action to "rip it out," as quickly and carefully as it could, consistent with NGIT's obligations to the federal government.  Ex. T.  In any event, in no instance was any version of AHLTA that contained any ImagXpress-based features distributed to any end user.  NGIT used ImagXpress for "development purposes" only; it never got to the "runtime distribution" stage because of the intervening dispute with Pegasus over the cost and terms of a runtime distribution license.  NGIT accordingly did not breach the Development License.

      *1.  Build 838*.  Build 838 was first delivered to the government on December 22, 2004, after passing through Stages 1-3 of the development process (Ex. W), and the government eventually approved some versions of it for Promotion to the Field (Ex. NN at 88:5-16).  Build 838 *did* include ImagXpress components, but there is no dispute that the sole reason NGIT put them there was to allow NGIT to write and test source code for a drawing tool to be rolled out in *later* versions of AHLTA.  Ex. A ¶ 16.  That is what Section 1 of the Development License refers to as "development purposes" – as both sides' experts agree.  See *supra* p. 12.

      By the same token, the ImagXpress components found in Build 838 do not constitute a "runtime" (as that term is used in Section 2 of the Development License), because Build 838 does not actually *use* those components for any purpose.  Ex. XX at 6 (Report of John Tabor, NGIT's technical expert and the former Deputy Development Manager for AHLTA) (Pegasus code is "not used by any of the features available in" Build 838); *id.* at 7-9; Ex. QQ at 58:4-14; Ex. RR at 77:1-7; Ex. FF at 140:14-15.  See also Ex. PP at 136:17-137:6 (components are not "runtimes" if they are

---

[8]  Around the same time, Pegasus complained to the government that it believed NGIT was infringing its copyright.  Ex. GG at 135:8-144:23.  At least from that point on, any infringement claim Pegasus might have would be against the United States, not NGIT, and would be subject to the exclusive jurisdiction of the Court of Federal Claims pursuant to 28 U.S.C. § 1498(b).  See *Croll-Reynolds Co.* v. *Perini-Leavell-Jones-Vinell*, 399 F.2d 913, 915 (5th Cir. 1968).

installed but not used as designed).  Indeed, *there is no drawing tool in Build 838 at all.*  Ex. XX at 6-7 (screenshots of Build 838).  Matthew Decker, Pegasus's expert in computer forensics, declined repeated invitations at his deposition to offer anything to the contrary.  See Ex. II at 193:13-15 ("[T]he drawing tab was not available in 838."); *id.* at 146:9-18 ("Q: . . . [H]ave you determined with respect to any version of 838 whether there is any Pegasus functionality? . . . A. I don't have an opinion as to whether the Pegasus software is being used to manipulate or open images, or being used for notation in those capacities within the program. I have no opinion one way or the other."); *id.* at 106:13-19 ("Q: Do you know, one way or the other, whether any functionality related to any [ImagXpress code] is available in 838 Patch 23? . . . A: I really don't have an opinion about how these files are used within that package, within any of the modules within 838."); *id.* at 107:5-10 ("Q: Do you have any understanding, one way or the other, whether any [ImagXpress features] are used in any way in AHLTA 838 Patch 23? . . . A:  Again, that's outside of the scope of my examination.").[9]

NGIT's understanding that its placement of ImagXpress components in Build 838 was covered by the first section of the Development License – and that a runtime distribution license would be required only when a completed drawing tool was ready for deployment – was repeatedly corroborated by Pegasus from 2003 to 2006.  This "[c]ourse of dealing, like trade usage, gives meaning to and supplements or qualifies the terms of" the Development License.  *Allapattah Services*,

---

[9]  In his report, Decker noted that if the ImagXpress components in Build 838 are deleted, the program prompts the user to reinstall them; from this, he concluded "that the AHLTA software cannot be operated without a copy of the Pegasus software installed."  Ex. UU at 8-9.  But as Tabor explained, the "reinstall" prompt has nothing whatever to do with AHLTA or ImagXpress; it is an automatic function within Windows, a fact uncontradicted by Pegasus.  Ex. XX at 5, 7; Ex. II at 136:15-17.  Windows prompts users to reinstall deleted files simply to check that any deletion was not inadvertent.  Ex. QQ at at 146:19-147:1; 149:9-15.  Because the deleted files are not actually *used* by AHLTA, though, a user can cancel the reinstallation process and AHLTA will run without the deleted files.  *Id.* at 147:2-6; 149:16-150:7.  Decker never tested to see if AHLTA would work without the ImagXpress components.  See Ex. II at 128:8-12 ("Q: Did you do any functional testing to confirm whether any Pegasus software is required by AHLTA? . . . A: That was outside the scope of my examination.").

61 F. Supp. 2d at 1315. ImagXpress was not the first product that NGIT licensed from Pegasus, and Pegasus had long made clear that NGIT did not need to begin discussing distribution licensing until it was "prepare[d] to deploy" a product that actually *used* a Pegasus component. See Ex. Z. See also Ex. AA (distinguishing between an SDK, which is needed "[t]o build an application," and a distribution license, which is needed "[t]o deploy an application using" that product).

Pegasus confirmed that this understanding applied to ImagXpress as well. Ex. BB. From 2004 to 2006, the parties regularly traded communications that demonstrated that NGIT was using the ImagXpress toolkit to create and test a derivative work-in-progress. See, *e.g.*, Ex. P (noting that "testers are testing the application"); Ex. Q (noting the development of a "patient record [feature] using Pegasus's application"). At no point did anyone at Pegasus assert the need for a distribution license. Ex. OO at 239:9-14. Indeed, as late as July 2006, Pegasus was still telling NGIT that it need only secure distribution licensing "if the team using [ImagXpress] has *completed* the project/application and [if it] is ready for *deployment*." Ex. CC (emphasis added). Pegasus's August 2006 demand that NGIT needed a *distribution* license for the *development* work it had been doing since 2004 was entirely inconsistent with Pegasus's previous statements, upon which NGIT had relied in performing its contractual obligations for the federal government.[10]

In short, the unrebutted evidence is that NGIT used ImagXpress in AHLTA Build 838 only

---

[10] Pegasus's long-running assurances to NGIT about the timing and pricing of distribution licensing are grounds for summary judgment in NGIT's favor on its Second Affirmative Defense of unclean hands, which incorporates the doctrine of equitable estoppel. See *McIntosh* v. *Hough*, 601 So. 2d 1170, 1171 n.3 (Fla. 1992) (permitting "the application of estoppel through the unclean hands doctrine"). Pegasus is estopped from claiming breach of license because: (1) it made "a representation as to a material fact that is contrary to a later-asserted position"; (2) NGIT "reli[ed] on that representation"; and (3) NGIT changed its position to its detriment based on "the representation and its reliance thereon." *Lewis* v. *Dep't of Health & Rehab. Servs.*, 659 So. 2d 1255, 1256-57 (Fla. Dist. Ct. App. 1995). See also *Quinn* v. *City of Detroit*, 23 F. Supp. 2d 741, 750 (E.D. Mich. 1998) (estopping licensor from asserting breach of license and infringement, and granting licensee "a reasonable period of time to transfer . . . to a new system in the case of a revocation of the license" when "[w]ithout a period of time to transfer to a new system, the City would have been left helpless, with no way to update cases or access information in the manner necessary to properly monitor cases.").

for permissible "development purposes," and never made a "distribution" of ImagXpress "runtimes." NGIT's conduct as to Build 838 thus provides no triable basis for Pegasus's breach of contract claim.

2. *Build 841.*  As noted above, although the drawing tool feature was not available in Build 838, NGIT *did* plan to include it in a later version of AHLTA, Build 841, which was about to begin beta testing when Pegasus first demanded that NGIT purchase a per-installation distribution license in August 2006.[11]  As explained earlier (*supra* p. 12), the software licensing experts agree that beta testing is a hallmark of the development process, and it therefore is an action squarely authorized by the first section of the Development License.  In any event, it is uncontradicted that no version of Build 841 ever was approved for Promotion to the Field by the government and there is no evidence that any version of Build 841 ever was installed anywhere.  Ex. NN at 96:14-21.[12]  Pegasus thus cannot survive summary judgment on this claim on the basis of NGIT's development of Build 841.

3. *Release 3.3.*  Finally, when the dispute with Pegasus arose in August 2006, NGIT was in the early stages of developing yet another version of AHLTA, Release 3.3, which the government expected to include a drawing tool feature.  In response to Pegasus's licensing demand, NGIT replaced ImagXpress with a toolkit made by a company called Medicomp.  Ex. LL at 39:3-11.  Accordingly, in February and March 2007, NGIT wrote new source code for a Medicomp-based drawing tool and removed all ImagXpress components that had been resident in prior versions of AHLTA.  Ex. A ¶ 17.  Although Release 3.3 *does* have a drawing tool feature, it is undisputed that it contains no components from the ImagXpress toolkit.  See Ex. XX at 10; Ex. II at 178:17-24.  It is also undisputed that Release 3.3 contains no functionality based on or related to ImagXpress.  See Ex.

---

[11] In the aftermath of those demands, NGIT disabled all drawing tool functionality from versions of 841 being delivered to the government for testing.  See Ex. QQ at 58:4-14; Ex. FF at 108:6-12, 140:9-22.

[12] None of the other versions of AHLTA – Build 839, Build 840, and Build 843, and Release 3.2 – ever was approved for Promotion to the Field, let alone installed anywhere.  Ex. NN at 110:7-14.

XX at 10; Ex. II at 196:25-197:4 ("Q: Can you say to a reasonable degree of certainty that there is any functionality in 3.3 that relies on Pegasus code? . . . A. I haven't conducted that testing.").

Lacking any evidence that Release 3.3 contains any ImagXpress software, Decker nonetheless speculates that, for three reasons, ImagXpress code *may* be in AHLTA Release 3.3. Even if the mere presence of ImagXpress components (as opposed to the presence of any features that actually use them) mattered, none of Decker's theories is sufficient to raise a triable issue on the point. First, though Decker could find no component of the ImagXpress toolkit in Release 3.3, he observes that the first version of Release 3.3 delivered to the government contained two files with names similar to those found in the ImagXpress toolkit. It is undisputed that these two files (known as "OCA files") were automatically created by Microsoft's Visual Basic 6, the program that NGIT used to write source code for AHLTA's drawing tool. Those files do not contain any computer code, and they are incapable of providing any functionality. Ex. YY at 4-6; Ex. QQ at 205:11-19; Ex. VV at 15; Ex. II at 75:4-8; 80:14-24. Those files are not Pegasus software. Ex. QQ at 203:11-205:19.

Second, Decker observes that a "help screen" in the first version of Release 3.3 stated that it contains ImagXpress software, a statement that also appears in some user manuals for that version. Ex. VV at 7-8, 12-14. The evidence is uncontested that those comments were inadvertently left in early versions of Release 3.3 (even after the ImagXpress components were deleted); they certainly do not rebut the uncontradicted evidence that Release 3.3 contains no Pegasus software. Ex. XX at 11. Third, Decker notes that, when he conducted keyword searches of the source code for Release 3.3 he found words, like "Pegasus," from which he infers that Release 3.3 must contain Pegasus software.[13]

---

[13]   Though Decker also noted that source code for Release 3.3 contained references to ImagXpress components, it is undisputed that no version of AHLTA built from this source code ever was delivered to the government. Ex. XX at 10; Ex. II at at 200:6-206:11.

But as Tabor explains, the fact that the word "Pegasus" can be found in Release 3.3 (in the help screen, for example) does not mean that the program contains ImagXpress (it does not).  Ex. YY at 6. Like Builds 838 and 841, Release 3.3 provides no for Pegasus's breach claim to proceed to trial.

The record is clear that NGIT took immediate action to disengage from Pegasus the very same day that Pegasus first asserted – incorrectly – that NGIT was obligated to pay "runtime distribution" fees on a per-installation basis.  Pegasus now contends that, because pieces of inoperable ImagXpress components remained in AHLTA, and that pre-printed user manuals continued to make reference to ImagXpress until they were replaced, NGIT is liable for millions of dollars in damages.  But NGIT complied with the Development License, and is entitled to summary judgment.

## II.   NGIT IS ENTITLED TO SUMMARY JUDGMENT ON PEGASUS'S COPYRIGHT INFRINGEMENT CLAIMS (COUNTS II AND III)

Pegasus's copyright infringement claims fail because NGIT's use of ImagXpress did not exceed the scope of the Development License.  See *Quinn*, 23 F. Supp. 2d at 749 ("If Defendant had a license to make a particular use of a copyrighted work, defendant cannot have committed infringement.").[14] Even if this Court declines to enter summary judgment in favor of NGIT on the breach of license claim, however, it still should grant summary judgment on the copyright infringement claims, because the hypertechnical infringement alleged by Pegasus is *de minimis*.

Courts have long recognized that liability for copyright infringement should not be imposed on "those who cause insignificant violations of the rights of others."   *Ringgold* v. *Black Entm't Television, Inc.*, 126 F.3d 70, 74 (2d Cir. 1997) (explaining "[t]he legal maxim '*de minimis non curat lex*' ( . . . 'the law does not concern itself with trifles') insulates from liability those who cause

---

[14] If this Court grants summary judgment on Count II (direct copyright infringement), then judgment also should be granted on Count III (secondary infringement, based upon the alleged direct infringement committed by Integic, which later merged into NGIT).  If "there is no direct infringement liability in the case, the remaining derivative theories of liability . . . fail as a matter of law."  *Oravec* v. *Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1151 (S.D. Fla. 2006).

insignificant violations of the rights of others."). Here, even if the Court concludes that Pegasus should be permitted to proceed to trial on the theory that a technical breach of the Development License occurred, the record is bereft of evidence that ImagXpress components ever were (or could have been) used by anyone who used any version of AHLTA.

"Technical violations" of a copyright – like copying a work that was never used – do not support a claim for copyright infringement. In *Knickerbocker Toy Co., Inc.* v. *Azrak-Hamway Intern., Inc.*, 668 F.2d 699, 703 (2d Cir. 1982), for example, the trial court rejected a claim for copyright infringement based on the defendant's use of plaintiff's illustration in a draft advertisement that was to be removed before the final version of the advertisement was printed and displayed. The Second Circuit affirmed. Although the defendant technically "used" the copyrighted work without a license, the alleged infringement "falls squarely within the principle of *de minimis non curat lex*." *Id.* at 703. As in *Knickerbocker*, the alleged infringement here is, at most, a technical violation that caused no damage or injustice because ImagXpress never was actually used in AHLTA.[15]

## III.    NGIT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V

To prevail on its trade secret claim (Count V), Pegasus must prove that it "possessed secret information and took reasonable steps to protect its secrecy"; and "the secret [that] it possessed was

---

[15] Even if the Court declines to grant summary judgment for NGIT as to all of Counts II and III, it should nonetheless do so with regard to Pegasus's claims for statutory damages and attorneys' fees. Dkt. 60 ¶¶ 63, 83. The Copyright Act provides that "no award of statutory damages or of attorney's fees . . . shall be made for any infringement of copyright commenced after first publication of the work and before the effective date of its registration." 17 U.S.C. § 412. Pegasus did not register its copyright for ImagXpress until July 3, 2007 (Dkt. 60 ¶ 48), years after it alleges that NGIT commenced its infringement (Dkt. 60 ¶¶ 20, 24)). See *Cornerstone Home Builders, Inc.* v. *McAllister*, 311 F. Supp. 2d 1351, 1352 (M.D. Fla. 2004) ("a plaintiff is not entitled to attorney's fees or statutory damages . . . when the work at issue is not registered with the copyright office at the time the alleged infringement occurred."). Pegasus cannot escape this conclusion by arguing that infringement continued after the copyright was registered in 2007 because infringement is deemed to "commence" for purposes of 17 U.S.C. § 412 with "the first act of infringement in [a] series of ongoing separate infringements." *Id.* See *Mason* v. *Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992) (Congress intended "that statutory damages be denied not only for *the particular infringement* that a defendant commenced before registration, but for all of that defendant's infringements of a work if one of those infringements commenced prior to registration.").

misappropriated" by NGIT. *Border Collie Rescue, Inc.* v. *Ryan,* 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006). The Court dismissed the first iteration of this claim because it lacked allegations as to what the trade secret was or how NGIT misappropriated it. Dkt. 56 at 6-7. In response, Pegasus asserts that the trade secret was the ImagXpress "source code," which NGIT improperly "accessed or obtained" and "distributed with certain AHLTA builds or releases." Dkt. 81 at 5.[16]

There is nothing in the record to support that claim. Indeed, Pegasus President Jack Berlin frankly conceded that he was not aware of any basis for the allegation that NGIT misappropriated ImagXpress source code, either by improperly accessing it or by distributing it. Ex. HH at 256:10-20. So far as Berlin was concerned, the basis for his company's trade secret claim was that "I don't put anything" past NGIT, and that "[u]ntil we get the chance" to take discovery, "we don't know anything." *Id.* at 255:16-18. Then, after having *taken* discovery (including our production of over 18 gigabytes of electronic data from AHLTA), Pegasus responded to our September 2008 interrogatory calling for any documents or facts to support its trade secret claim by stating in June 2009 that its "investigation into the matter continues." Ex. DD at 19. Once discovery is over, Pegasus reported, it "should thereafter be able to identify such documents." *Ibid.* Pegasus has never done so, however, since the scurrilous allegation that NGIT misappropriated Pegasus's source code is fiction.

## IV.   NGIT IS ENTITLED TO SUMMARY JUDGMENT ON PEGASUS'S FDUTPA AND LANHAM ACT CLAIMS (COUNTS VI AND VII)

Pegasus claims that NGIT violated both Florida's Deceptive and Unfair Trade Practices Act

---

[16] Pegasus does not claim that the ImagXpress toolkit or any of its components ("object code") are trade secrets, nor could it, since that software is freely available on the Pegasus website for anyone to use. Ex. XX at 8-9; Dkt. 81 at 5 ("Pegasus has only alleged that the source code underlying the software constitutes a trade secret."). See also *Trandes Corp.* v. *Guy F. Atkinson Co.,* 996 F.2d 655, 663 n.8 (4th Cir. 1993) ("In the ordinary case, the owner of trade secret computer software will maintain the secrecy of the source code but freely distribute the object code. . . . In such cases, the owner of the software cannot claim trade secret protection for the object code because its disclosure to the public destroyed its secrecy.") (internal citation omitted).

("FDUTPA") (Count VI)[17] and the Lanham Act (Count VII)[18] because NGIT caused "thousands of end users" to use an ImagXpress-based drawing tool "with no knowledge that they [were] actually using Pegasus' software."   Dkt. 60 ¶¶ 119, 130.   NGIT is entitled to summary judgment on both claims, because the record is devoid of evidence of the requisite consumer confusion.   In fact, the record *precludes* a finding that any consumers were confused.

First, it is logically impossible that healthcare providers (AHLTA's "end users") could have been denied knowledge "that they [were] actually using Pegasus software" (*ibid.*) when, in fact, that *were not* using that software.   As discussed throughout:   *No ImagXpress-based drawing tool (or any other feature) was ever deployed to the field.*   It is well settled that there can be no consumer confusion (whether under FDUTPA or the Lanham Act) about a product's origin when that product isn't present in the first place.   See, *e.g.*, *Dastar Corp.* v. *Twentieth Century Fox Film Corp.*, 523 U.S. 23, 38 (2003) (Lanham Act claim fails when defendant was the "origin" of the products it sold as its own); *North American Clearing*, 666 F. Supp. 2d at 1310.   Not surprisingly, Pegasus cannot provide *any* evidence of actual consumer confusion, which is "undiputed[ly] . . . the best evidence of a likelihood of confusion."   *Frehling Enters., Inc.* v. *Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999).   Nor can Pegasus point to any other factors that demonstrate consumer confusion was

---

[17] To prevail on its FDUTPA claim, Pegasus must prove that NGIT committed a "deceptive act or unfair practice" that resulted in actual damage to Pegasus.   *North Am. Clearing, Inc.* v. *Brokerage Computer Systems, Inc.*, 666 F. Supp. 2d 1299, 1310 (M.D. Fla. 2009).   The Court has already held that, to avoid preemption of its FDUTPA claim, Pegasus must prove an "extra element" of deception or unfair practice beyond mere copyright infringement, such as consumer confusion.   Dkt. 56 at 9.

[18] Section 1125(a) of the Lanham Act allows a claim for "reverse passing off," which requires proof "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin."   *North American Clearing*, 666 F. Supp. 2d at 1309.   To succeed on its this claim, Pegasus must demonstrate that consumers were likely to be confused into believing, incorrectly, that the Pegasus drawing tool actually originated with NGIT.   See, *e.g.*, *Custom Mfg. and Eng'g, Inc.* v. *Midway Servs., Inc.*, No. 803CV2671T30, 2005 WL 1313829, at *5 (M.D. Fla. May 31, 2005) ("The fatal weakness in [plaintiff's] claim is that there is no evidence of any likelihood of confusion.   Confusion is an essential element of the claim."), *aff'd* 508 F.3d 641, 651 (11th Cir. 2007).

likely.  See, *e.g.*, *PHA Lighting Design, Inc.* v. *Kosheluk*, No. 1:08-cv-01208, 2010 WL 1328754, at *4 (N.D. Ga. Mar. 30, 2010).  And even if Pegasus had adduced evidence of consumer confusion, NGIT still would be entitled to summary judgment on these claims because there is no evidence that any consumer confusion led to actual damage, such as a decrease in sales or loss of "goodwill or reputation."  *Id.* at *5 ("even if Defendants falsely designated the origin of the services presented in its brochure, and even if such designation is likely to confuse," plaintiff still failed to "show that it was harmed by Defendants' false designation."); *Macias* v. *HBC of Florida, Inc.*, 694 So. 2d 88, 90 (Fla. Dist. Ct. App. 1997) (dismissing FDUTPA claim because plaintiff alleged only "speculative losses").

Second, to the extent Pegasus asserts that the "consumer" here is the United States military – the party to which NGIT delivered AHLTA – there is no evidence that it could have been confused about the origin of the drawing tool (or any other feature in AHLTA).  The military had complete access to, and frequently used, the database in which NGIT recorded the technical work that it did on AHLTA, including the addition and removal of ImagXpress computer code from the versions of AHLTA in development.  Ex. A ¶ 10.  In addition, every delivery of AHLTA to the government was accompanied by a detailed list of the software components in it.  Ex. LL at 69:19-70:18.  See *M.G.B. Homes, Inc.* v. *Ameron Homes, Inc.*, 903 F.2d 1486, 1494 (11th Cir. 1990) (no consumer confusion when consumer "knew full well that the basic floor plan of their home" was created by the plaintiff.).

## CONCLUSION

For the foregoing reasons, NGSC's Motion for Summary Judgment should be granted.

Respectfully submitted,

/s/ Gary A. Orseck

Lawrence B. Lambert                      Gary A. Orseck (Admitted *pro hac vice*)
Fla. Bar No. 0032565                     Ariel N. Lavinbuk (Admitted *pro hac vice*)
LASH & GOLDBERG LLP                      ROBBINS, RUSSELL, ENGLERT,
Bank of America Tower, Suite 1200        ORSECK, UNTEREINER & SAUBER LLP
100 S.E. 2nd Street                      1801 K Street, NW, Suite 411L
Miami, Florida 33131                     Washington, DC 20006
PH: (305) 347-4040                       Telephone: (202) 775-4500
Fax: (305) 347-4050                      Fax: (202) 775-4510
llambert@lashgoldberg.com                gorseck@robbinsrussell.com

September 13, 2010                       *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 13, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of the electronic filing to the following: David D. Ferrentino, Esq., David Forziano, Esq., Donald W. Stanley, Jr., Esq., and Richard Anthony Harrison, Esq., counsel for Plaintiffs.

/s/ Ariel Lavinbuk
Ariel N. Lavinbuk (Admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411L
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510
alavinbuk@robbinsrussell.com