UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PEGASUS IMAGING CORP.,

    Plaintiff,

vs.                                                                 Case No. 8:07-CV-1937-T-27EAJ

NORTHROP GRUMMAN CORP.,
et al.,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** is Defendant Northrop Grumman Systems Corporation's Motion for Summary Judgment (Dkt. 130). Plaintiff has responded in opposition (Dkt. 127). Upon consideration, the motion (Dkt. 130) is GRANTED in part and DENIED in part.

### Background

This action involves the use of Pegasus Imaging Corporation's software in a manner which, Pegasus contends, violated its license agreement. Pegasus sues for breach of contract, copyright infringement, and misappropriation of trade secrets, as well as violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and Lanham Act. The bulk of Pegasus's claims involve two entities which later merged into Northrop Grumman System Corporation ("NGSC").[1]

NGSC was the systems integrator for the Defense Department's electronic health records system, the Armed Forces Health Longitudinal Technology Application ("AHLTA"). In 2003, the Defense Department requested that NGSC develop a drawing tool for AHLTA. To implement this feature, NGSC downloaded one copy of Pegasus's ImagXpress, a software development toolkit that

---

[1] Unless otherwise noted, "NGSC" will refer to NGSC as well as Integic Corporation and Northrop Grumman Information Technology, which are the two entities that subsequently merged into NGSC.

enables programmers to add imaging features to a derivative product. To use the software, NGSC entered into a 'clickwrap' software license agreement.

The license agreement, which is the focal point of the parties' dispute, contains two distinct licenses. The first is a license for development:

> GRANT OF LICENSE. This Pegasus Imaging Corporation, ("PEGASUS") Agreement ("License") permits Licensee ("LICENSEE") the right to use one copy of a properly registered Pegasus Development Toolkit ("TOOLKIT") for development purposes on any single computer, provided the TOOLKIT is in use on only one computer at any time. TOOLKIT is "in-use" on a computer when it is loaded into temporary memory (i.e. RAM) or installed into the permanent memory (i.e. hard disk, CD-ROM, or other storage device) of that computer.

The second is a limited distribution license:

> REDISTRIBUTION OF THE TOOLKIT RUNTIMES. To obtain rights to distribute TOOLKIT runtimes as part of the LICENSEE's software application or derivative works ("PRODUCT"), you must acknowledge and uphold this License Agreement and agree to notify PEGASUS immediately of any changes in status or violations. PEGASUS grants the LICENSEE, a limited, non-exclusive, right to use, reproduce, display or otherwise distribute or transfer ONE (and only one) copy of the TOOLKIT runtime, as an integral part of PRODUCT, in executable form only to a single CPU. . . . In all other cases, PEGASUS grants the LICENSEE, a limited, non-exclusive, right to use, reproduce, display or otherwise distribute or transfer limited copies of TOOLKIT runtimes, as an integral part of PRODUCT, in executable form only, provided that [twelve enumerated conditions are satisfied].

After entering into this agreement, NGSC began using ImagXpress to create a drawing tool and an electronic signature function in AHLTA. There is evidence that NGSC delivered to the Defense Department some 38 versions of AHLTA that contained ImagXpress. For summary judgment purposes, however, the parties focus on three: Build 838, Build 841, and Release 3.3.

Build 838 included an inoperable version of ImagXpress. NGSC intentionally placed the drawing tool behind a switch so the feature could be fully developed for release in a later version. After delivery, the Defense Department tested numerous versions of Build 838 and approved several

for distribution to military healthcare providers or, in NGSC's parlance, 'promotion to the field.' Build 838u23 was installed on approximately 100,000 end user devices in 156 locations.

Build 841 contained a usable ImagXpress drawing tool. The Defense Department tested several versions of Build 841 but did not approve any for promotion to the field. There is evidence that the drawing tool was again placed behind a switch at some point during the testing phase.

Release 3.3 incorporated a different manufacturer's drawing tool. However, this version did contain two ImagXpress files. In addition, Release 3.3's Help screen and User's Manual stated, "The drawing tool itself is COTS software. It is the ImagXpress Professional v7.0, developed by Pegasus Imaging Corporation." The User's Manual also noted, "The Third-Party COTS Pegasus software has been integrated into AHLTA to provide this capability." After testing, the Defense Department approved Release 3.3 for promotion to the field. This version has been widely distributed to military health care providers.

Pegasus filed this action, alleging the use of ImagXpress exceeded the scope of the license agreement. NGSC moved for summary judgment, arguing that its use of the software was permitted by the license agreement and that there is no evidence supporting the remaining claims.

**Standard**

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*,

323 F.3d 920, 924 (11th Cir. 2003). Rather, "the evidence of the non-movant is to be believed." *Hickson*, 357 F.3d at 1260 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). All factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Id*. In resolving a motion for summary judgment, therefore, "the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *Morrison*, 323 F.3d at 924.

## Discussion

### A.  Breach of the license agreement

It is undisputed that the development license restricts use of the ImagXpress toolkit to a single computer. The toolkit is considered "in-use" whenever "it is loaded into temporary memory (i.e. RAM) or installed into the permanent memory (i.e. hard disk, CD-ROM, or other storage device) of [a] computer." NGSC has not conclusively demonstrated its compliance with this provision. There is evidence that NGSC placed the toolkit on a server for several of its developers to access. Email correspondence shows NGSC's developers shared the licensing code Pegasus provided to unlock the toolkit. Further email correspondence suggests the toolkit was placed on a thumb drive and shared by the developers. At a minimum, there is a triable issue of fact as to whether NGSC breached the development license.

### B.  Copyright infringement

#### 1.  The scope of the license

A licensee may be liable for copyright infringement if its actions exceed the scope of its license. *See Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1217 (M.D. Fla. 2007); *Leutwyler v. Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 306 (S.D.N.Y. 2001). Pegasus argues NGSC exceeded the scope of the license in Build 838, Build 841, and Release 3.3.

Pegasus submitted evidence that NGSC used ImagXpress to implement two features in

AHLTA: an electronic signature and a drawing tool. NGSC has not demonstrated that it fully complied with the license agreement in developing and distributing AHLTA versions containing the electronic signature feature. Accordingly, NGSC is not entitled to summary judgment with respect to the electronic signature.

As for the drawing tool, NGSC takes the position that none of its activities constituted a 'runtime distribution' within the meaning of the license agreement. NGSC therefore concludes that all of its activities must have fallen within the permissible scope of the license for development.

The development license, however, simply accorded the "right to use one copy" of the ImagXpress toolkit "for development purposes on any single computer." The license agreement is silent on the very matters NGSC contends are protected. Indeed, there is no provision for distribution of software containing hidden, non-functioning ImagXpress components. Nor does the development license expressly authorize distribution of derivative products to third-parties, customers, or potential end-users for testing purposes. The development license likewise fails to address distribution of '.OCA' files that were automatically created from other ImagXpress files.

NGSC suggests that trade usage places these activities within the ambit of the development license. Trade usage may "explain[] or supplement[]" a contract such as the development license, which is governed by Florida's Uniform Commercial Code. Fla. Stat. § 672.202 (2004); *see Tingley Sys.*, 509 F. Supp. 2d at 1214 (UCC applies to software license agreements).[2] Where a "written trade code or similar writing," is not made part of the record, as here, "[t]he existence and scope of such a [trade] usage are to be proved as facts." Fla. Stat. § 671.205(2) (2004). Although the parties appear to be in agreement that a development license contemplates at least some level of testing, their agreement ends there. There is contradictory evidence as to whether a license for development

---

[2] There is no contention that the parties did not intend the license agreement to be the "final expression of their agreement with respect to" the development license. Fla. Stat. § 672.202.

carries an "expectation" in the trade of testing by third-parties, the client, and potential end-users, as well as the right to distribute inoperable software components. *Id.*

NGSC also relies on the parties' course of dealing in other Pegasus products. Florida law defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Fla. Stat. § 671.205(1) (2004). NGSC points to a series of emails in which Pegasus stated that a distribution license would be required to "deploy" an application derived from a certain Pegasus product. This correspondence is inconclusive, however, as it is unclear what Pegasus's representatives meant by "deploy." A jury could reasonably understand "deploy" to refer to NGSC's distribution to the Defense Department. Indeed, there is evidence that NGSC's development activities concluded upon its submission of a particular version of AHLTA to the Defense Department. At that point, NGSC had no control over the Defense Department's use of the software, its testing, or its distribution to health care providers.

There are, therefore, triable fact issues as to whether the trade 'expected' that a development license would permit the activities undertaken by NGSC. Likewise, there are material fact issues regarding whether the parties' course of dealing under the license agreement permitted NGSC's actions. And NGSC made no effort to demonstrate that its activities were permissible under the limited runtime distribution license. As NGSC has not proven that its actions fell within the scope of the license agreement, summary judgment is improper. *See Tingley Sys.*, 509 F. Supp. 2d at 1217.

### 2.  *Di minimus* infringement

NGSC argues any copyright infringement was, at most, a technical violation that did not result in damages. NGSC relies on *Knickerbocker Toy Co. v. Azrak-Hamway International, Inc.*, 668 F.2d 699 (2d Cir. 1982). But unlike *Knickerbocker*, in which an infringing illustration was "only an office copy which was never used," it is undisputed that NGSC distributed Pegasus's software to the

Defense Department in numerous versions of AHLTA. 668 F.2d at 702. That ImagXpress was inaccessible in some versions does not render the infringement *di minimus*. *See Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 359-60 (6th Cir. 2007).

### 3. Statutory damages and attorney's fees

Under the Copyright Act, "no award of statutory damages or of attorney's fees . . . shall be made for . . . any infringement of copyright commenced . . . before the effective date of its registration . . . ." 17 U.S.C. § 412. Where there is a series of ongoing separate infringements, the infringement is deemed to 'commence' when the first act of infringement occurs. *See Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992); *Cornerstone Home Builders, Inc. v. McAllister*, 311 F. Supp. 2d 1351, 1352 (M.D. Fla. 2004). It is undisputed that the first act of alleged infringement occurred before Pegasus registered its copyright on July 3, 2007.

Notwithstanding, Pegasus seeks statutory damages and attorney's fees related to Build 838u23, which was delivered on May 21, 2008. Pegasus argues the infringement in Build 838u23 cannot be deemed to commence before registration because NGSC had previously ceased infringing the copyright. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158-59 (2d Cir. 2007) ("The legislative history of section 104A suggests that Congress understood section 412 to mean that a post-registration act of infringement will not be deemed to have commenced before registration if the infringing activity ceased for an appreciable period of time."). Pegasus relies on a statement in NGSC's brief that "in February and March 2007," NGSC removed from Release 3.3 "all ImagXpress components that had been resident in prior versions of AHLTA." (Dkt. 130 at 19; *Id.*, Ex. A ¶ 17). But the record contains no evidence that NGSC removed ImagXpress from Build 838 or any other versions of AHLTA. In fact, ImagXpress components appeared in Builds 838u21 and 838u22, both of which were delivered after March 2007. (Dkt. 127-44, NGIT Interrog. Resp. ¶ 4; Dkt. 127-31, Decker Report at ¶ 3.13). Any alleged infringement in Build 838 never ceased. Accordingly, § 412

precludes recovery of statutory damages and attorney's fees.

C. **Florida Uniform Trade Secrets Act**

To prevail on its Florida Uniform Trade Secrets Act claim, Pegasus must establish that NGSC misappropriated its trade secret. *See* Fla. Stat. § 688.002. It is undisputed that the ImagXpress source code constitutes a trade secret. The question is whether any misappropriation occurred.

Pegasus argues NGSC engaged in misappropriation by reverse-engineering its source code. To protect the secrecy of the source code, Pegasus's license agreement expressly provided that "LICENSEE may not reverse engineer, decompile or disassemble TOOLKIT." Essentially, the license agreement allowed use of the software so long as the licensee agreed to refrain from attempting to discover Pegasus's trade secret through reverse-engineering. *See* Fla. Stat. § 688.002(1)-(2) (misappropriation occurs when trade secret is acquired by "improper means" which includes "breach or inducement of a breach of a duty to maintain secrecy").

There is evidence suggesting that NGSC incorporated Pegasus's source code in a 'common DLL.' There is also evidence that this task could only be accomplished through reverse-engineering the source code. Summary judgment is therefore inappropriate.

D. **FDUTPA and the Lanham Act**

Pegasus's FDUTPA and Lanham Act claims are premised on two acts. First, NGSC is charged with failing to give attribution to Pegasus for several AHLTA versions which contained ImagXpress components. Second, Pegasus contends NGSC falsely represented that the drawing tool in Release 3.3 was derived from ImagXpress.

A claim for damages under FDUTPA requires proof of actual damages. *See, e.g., City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008). Similarly, claims for damages under the Lanham Act for 'passing-off' and 'reverse-passing off' require proof "that the plaintiff was harmed by the defendant's false designation of origin." *Syngenta Seeds, Inc. v. Delta Cotton Co-op.,*

*Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006); *North Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.*, 666 F. Supp. 2d 1299, 1309 (M.D. Fla. 2009).

NGSC argues there is no evidence that Pegasus sustained any damages on account of the acts which comprise its FDUTPA and Lanham Act claims. Pegasus, for its part, has not pointed to any record evidence that arguably refutes this contention. Indeed, Pegasus has not identified any evidence of lost profits, injury to its goodwill or reputation, expenses associated with preventing or remediating customer confusion, or any other damages. *See Syngenta Seeds,* 457 F.3d at 1278. In the absence of record evidence of damages caused by the false designation of origin, NGSC is entitled to partial summary judgment on Pegasus's claims for damages under FDUTPA and the Lanham Act.

## Conclusion

Accordingly, Defendant Northrop Grumman Systems Corporation's Motion for Summary Judgment (Dkt. 130) is GRANTED *in part*. NGSC is entitled to partial summary judgment as to (1) Pegasus's claim for statutory damages and attorney's fees under the Copyright Act, (2) Pegasus's claim for damages under FDUTPA, and (3) Pegasus's claim for damages under the Lanham Act. The motion is denied in all other respects.

**DONE AND ORDERED** this 4th day of November, 2010.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record